IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-6

 No. 231A18

 Filed 5 February 2021

 THE COMMITTEE TO ELECT DAN FOREST, A POLITICAL COMMITTEE

 v.
 EMPLOYEES POLITICAL ACTION COMMITTEE (EMPAC), A POLITICAL
 COMMITTEE

 Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of

 the Court of Appeals, 260 N.C. App. 1 (2018), reversing an order of summary

 judgment entered on 15 February 2017 by Judge Allen Baddour in Superior Court,

 Wake County. On 5 December 2018, the Supreme Court allowed defendant’s petition

 for discretionary review as to additional issues. Heard in the Supreme Court on 4

 November 2019.

 Walker Law Firm, PLLC, by David Steven Walker, II, for plaintiff.

 Stevens Martin Vaughn & Tadych, by C. Amanda Martin and Michael J.
 Tadych, for defendant.

 HUDSON, Justice.

¶1 At issue here is a question of first impression for our Court: whether the North

 Carolina Constitution limits the jurisdiction of our courts in the same manner as the

 standing requirements Article III imposes on federal courts, including the
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 requirement that the complaining party must show she has suffered “injury in fact,”

 even where an Act of the North Carolina General Assembly expressly confers

 standing to sue on a party, as it did in N.C.G.S. § 163-278.39A(f) (2011) (now

 repealed). We hold that it does not, and we affirm the decision of the Court of

 Appeals.1

 I. Factual Background and Procedural History

¶2 In 2012, Linda Coleman and Dan Forest were, respectively, the Democratic

 and Republican candidates for Lieutenant Governor of North Carolina in the general

 election. The Employees Political Action Committee (“EMPAC” or “defendant”), a

 political action committee for the State Employees Association of North Carolina

 (SEANC), ran television advertisements supporting Ms. Coleman. According to

 plaintiff’s complaint, the original version of the advertisement placed by EMPAC

 included a photograph of an individual that was approximately one-eighth the height

 of the full advertisement and, at any rate, was not a full-screen picture as then

 required by law. Furthermore, the individual in the picture, Dana Cope, was neither

 the Chief Executive Officer nor the treasurer of EMPAC as required by then-existing

 law.

 1 We also hold that discretionary review was improvidently allowed as to the
 additional issue.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

¶3 After discovering the ad, the Committee to Elect Dan Forest (hereinafter,

 “plaintiff” or “the Committee”) sent a notice and letter to the North Carolina State

 Board of Elections and EMPAC regarding the size of the picture. The notice did not

 mention that the wrong individual was pictured. EMPAC subsequently removed the

 advertisement and replaced it with one including a full-screen picture. The full-screen

 picture in the second advertisement was also of Mr. Cope, and therefore also failed to

 comply fully with disclosure requirements.

¶4 Mr. Forest ultimately won the 2012 election for Lieutenant Governor.

 Thereafter, on 9 March 2016, his Committee filed a complaint in the Superior Court

 of Wake County against EMPAC, alleging violations of N.C.G.S. § 163-278.39A.

¶5 In 1999, the North Carolina General Assembly enacted N.C. Session Law 1999-

 453, codified at N.C.G.S. § 163-278.38Z et seq. (2011) (hereinafter, “Disclosure

 Statute”), as a “Stand By Your Ad” law.2 The Disclosure Statute provided specific

 requirements for television and radio ads placed by candidate campaign committees,

 political action committees, and others supporting or opposing candidates. See

 generally N.C.G.S. § 163-278.39A. In pertinent part, the Disclosure Statute provided

 that television ads by political action committees “shall include a disclosure

 statement spoken by the chief executive officer or treasurer of the political action

 2 N.C.G.S. § 163-278.39A was repealed by the General Assembly effective 1 January

 2014. Session Law 2013-381, § 44.1.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 committee and containing at least the following words: ‘The [name of political action

 committee] political action committee sponsored this ad opposing/supporting [name

 of candidate] for [name of office].’ ” Id. § 163-278.39A(b)(3). Furthermore, the

 Disclosure Statute required that, for all ads on television falling under the statute,

 “an unobscured, full-screen picture containing the disclosing individual, either in

 photographic form or through the actual appearance of the disclosing individual on

 camera, shall be featured throughout the duration of the disclosure statement.” Id.

 § 163-278.39A(b)(6).

¶6 The Disclosure Statute also included a notable enforcement mechanism. In a

 section entitled “Legal Remedy,” it created a private cause of action as follows:

 [A] candidate for an elective office who complied with the
 television and radio disclosure requirements throughout
 that candidate’s entire campaign shall have a monetary
 remedy in a civil action against (i) an opposing candidate
 or candidate committee whose television or radio
 advertisement violates these disclosure requirements and
 (ii) against any political party organization, political action
 committee, individual, or other sponsor whose
 advertisements for that elective office violates these
 disclosure requirements[.]3

 3 A subsection of this section provided that, as a condition precedent to bringing suit

 under the statute, the complaining party must file a notice with the State Board of Elections
 or a county board of elections (for statewide and nonstatewide candidates, respectively) “after
 the airing of the advertisement but no later than the first Friday after the Tuesday on which
 the election occurred.” N.C.G.S. § 163-278.39A(f)(1). The other subsections provided a
 formula for calculating damages, including treble damages in certain circumstances, and
 shifted attorneys’ fees to a party found to be in violation of the statute. Id. §§ 163-
 278.39A(f)(2), (3).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Id. § 163-278.39A(f). The North Carolina Court of Appeals has previously

 characterized the cause of action created by the General Assembly in the Disclosure

 Statute as “unique in the world of election law.” Friends of Joe Sam Queen v. Ralph

 Hise for N.C. Senate, 223 N.C. App. 395, 403 n.7 (2012).

¶7 Plaintiff’s complaint alleged two violations of the Disclosure Statute by

 EMPAC: (1) from 8 October through 25 October 2012, EMPAC ran a television ad

 that did not include “a full-screened picture containing the disclosing individual” but

 a much smaller one; and (2) Mr. Cope, the individual pictured in both versions of the

 ad, was not in fact “the Chief Executive Officer or treasurer of EMPAC.” 4 The

 complaint included as attachments an affidavit from Mr. Forest attesting the

 Committee was bringing the complaint on his behalf, records of the proposed schedule

 for ad run times with Time Warner Cable, the invoices for the ads, and copies of the

 notice and letter sent to the State Board of Elections and EMPAC. Defendant filed an

 answer and motion to dismiss based on lack of standing, which was denied. After

 failing to answer discovery, plaintiff voluntarily dismissed the lawsuit on 30 June

 2015 and refiled on 9 March 2016.

 4 In order to preserve a claim under the Disclosure Statute, the Committee was
 required to file a Notice of Complaint with the State Board of Elections within a certain time
 period after the election. N.C.G.S. § 163-278.39A(f)(1) (2011). While the Forest Committee
 presented evidence that it had filed such a notice in a timely manner, the notice contained
 only the allegation of the incorrectly-sized picture, not the allegation relating to the identity
 of the disclosing individual. As a result, the Committee has not preserved the claim that this
 aspect of the Disclosure Statute was violated.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

¶8 After discovery in the case proceeded, defendant filed a motion for summary

 judgment on 29 June 2016, arguing the Disclosure Statute violated the First

 Amendment as a content-based restriction on speech. After hearing the motion on 16

 August 2016, the trial court entered an order on 15 February 2017 granting

 defendant’s motion for summary judgment, stating that “plaintiff ha[d] failed to

 allege any forecast of damage other than speculative damage” and that “[i]n the

 absence of any forecast of actual demonstrable damages, the statute at issue is

 unconstitutional as applied.”5 Plaintiff gave timely notice of appeal to the North

 Carolina Court of Appeals.

¶9 In a split decision issued on 19 June 2018, the Court of Appeals reversed the

 trial court’s grant of summary judgment to EMPAC. Comm. to Elect Dan Forest v.

 Employees Pol. Action Comm. (EMPAC), 260 N.C. App. 1, 2 (2018). The majority

 reasoned that by “actual demonstrable damages” the trial court meant the Committee

 lacked standing to sue because Mr. Forest had not shown adequate “injury.” Relying

 on decisions of this Court, the majority held the Committee had standing to sue

 because the Disclosure Statute creates a private right of action for a candidate

 against a party when that party runs an ad in the candidate’s election violating the

 5 We note it is not clear from the trial court’s wording whether by this rationale it

 meant that plaintiff had not suffered injury sufficient to give it standing to sue or that the
 damage award imposed by the statute was constitutionally excessive without a showing of
 “actual demonstrable damages.” The parties and the Court of Appeals addressed both of these
 arguments on appeal, so both arguments are preserved.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Statute and “the breach of the private right, itself, constitutes an injury which

 provides standing to seek recourse.” Id. at 8. The majority further held the damages

 awarded under the Disclosure Statute were not unconstitutionally excessive even

 absent a showing of actual damages and that the Disclosure Statute did not per se

 violate the First Amendment, as EMPAC had argued on appeal. Id. at 11–12.

¶ 10 Chief Judge McGee dissented from the majority decision of the Court of

 Appeals, maintaining that plaintiff had not satisfied the condition precedent required

 by the Disclosure Statute and also that plaintiff lacked standing to sue because it had

 not shown “actual harm.” Id. at 13 (McGee, C.J., dissenting). While noting that

 “North Carolina courts are not constitutionally bound by the standing jurisprudence

 established by the United States Supreme Court[,]” the dissent also noted that North

 Carolina appellate courts had previously applied United States Supreme Court

 decisions to questions of standing and, therefore, United States Supreme Court

 precedent is binding on the Court of Appeals. Id. at 14. The dissent noted that our

 courts have used the language “injury in fact” to describe the standing inquiry and

 then cited and extensively reviewed the recent United States Supreme Court decision

 in Spokeo, Inc. v. Robins, 136 S.Ct. 1540 (2016), to support the proposition that the

 North Carolina Constitution imposes the same “injury-in-fact” requirements of a

 “concrete” and “particularized” injury as the United States Constitution imposes on

 federal courts, including the implication that a statutory conferral of standing,
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 without more, does not necessarily give a party sufficient interest to have standing to

 sue. Comm. to Elect Dan Forest, 260 N.C. App. at 14–16. The dissent concluded,

 following the reasoning in Spokeo, that a statutory grant of standing does not

 necessarily confer standing on a party under the North Carolina Constitution absent

 a concrete and particularized injury in fact and, because the interests vindicated by

 the statute were public and not private, the Committee had not suffered adequate

 harm to satisfy the injury requirements for standing. Id. at 19.

¶ 11 EMPAC appealed to this Court based on the dissent. This Court also granted

 EMPAC’s petition for discretionary review of additional issues, which asked this

 Court to determine whether the Disclosure Statute was an unconstitutional

 restriction on EMPAC’s free-speech rights and what standard should apply to that

 inquiry.

 II. Standard of Review

¶ 12 We review the grant or denial of summary judgment de novo. Variety

 Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 523 (2012).

 Summary judgment shall be granted “if the pleadings, depositions, answers to

 interrogatories, and admissions on file, together with the affidavits, if any, show that

 there is no genuine issue as to any material fact and that any party is entitled to a

 judgment as a matter of law.” N.C.G.S. 1A-1, Rule 56(c) (2019). In ruling on a

 summary judgment motion, we “consider the evidence in the light most favorable to
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 the non-movant, drawing all inferences in the non-movant’s favor.” Morrell v. Hardin

 Creek, Inc., 371 N.C. 672, 680 (2018). “We review constitutional questions de novo.”

 State ex rel. McCrory v. Berger, 368 N.C. 633, 639 (2016).

 III. Analysis

¶ 13 Defendant argues plaintiff has failed to establish an “injury in fact” sufficient

 to have standing to sue under the North Carolina Constitution. Plaintiff argues that,

 unlike the United States Constitution, the North Carolina Constitution does not

 require a plaintiff to make an additional showing of injury where a statutory right of

 action is conferred by the General Assembly in order for the case to come within the

 power of our courts. Whether the North Carolina Constitution limits the jurisdiction

 of our courts in the same manner as the standing requirements Article III6 imposes

 on federal courts, including the requirement that the complaining party show “injury

 in fact,” even where an Act of the General Assembly, such as the Disclosure Statute

 here, expressly confers a statutory cause of action, is a question of first impression

 for this Court.7 While we have held the Court of Appeals errs in relying on federal

 standing doctrine, and, specifically, that “[w]hile federal standing doctrine can be

 instructive as to general principles . . . and for comparative analysis, the nuts and

 6 U.S. Const., Art. III, sec. 2.
 7 We note, as Chief Judge McGee did in dissent below, our Court of Appeals has
 previously decided that in some circumstances the federal standing requirements also apply
 to North Carolina law. See, e.g., Neuse River Foundation, Inc. v. Smithfield Foods, Inc., 155
 N.C. App. 110, 113–15 (2002); Coker v. DaimlerChrysler Corp., 172 N.C. App. 386, 390–92
 (2005). This Court is not bound by those precedents.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 bolts of North Carolina standing doctrine are not coincident with federal standing

 doctrine[,]” Goldston v. State, 361 N.C. 26, 35 (2006), we have declined to delineate

 those differences. Our silence on this fundamental matter has engendered

 substantial confusion and disagreement in the lower courts and we end it today.

¶ 14 North Carolina courts recognized nearly sixteen years before Marbury v.

 Madison, 5 U.S. (1 Cranch) 137 (1803), that it is the duty of the judicial branch to

 interpret the law, including the North Carolina Constitution. See Bayard v.

 Singleton, 1 N.C. (Mart.) 5 (1787). This duty includes the responsibility to construe

 the limits on the powers of the branches of government created by our Constitution.

 See, e.g., Cooper v. Berger, 370 N.C. 392 (2018); State ex rel. McCrory v. Berger, 368

 N.C. 633 (2016).

 A. Textual Analysis

¶ 15 As ours is a written constitution, we begin with the text. See State ex rel.

 Martin v. Preston, 325 N.C. 438, 449 (1989) (“In interpreting our Constitution—as in

 interpreting a statute—where the meaning is clear from the words used, we will not

 search for a meaning elsewhere.”).

 The will of the people as expressed in the Constitution is
 the supreme law of the land. In searching for this will or
 intent all cognate provisions are to be brought into view in
 their entirety and so interpreted as to effectuate the
 manifest purposes of the instrument. The best way to
 ascertain the meaning of a word or sentence in the
 Constitution is to read it contextually and compare it with
 other words and sentences with which it stands connected.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Id. at 449. In construing the document, “[w]e are guided by the basic principle of

 constitutional construction of giving effect to the intent of the framers.” State v. Webb,

 358 N.C. 92, 94 (2004) (cleaned up). “Constitutional provisions should be construed

 in consonance with the objects and purposes in contemplation at the time of their

 adoption. To ascertain the intent of those by whom the language was used, we must

 consider the conditions as they then existed and the purpose sought to be

 accomplished.” Id.

¶ 16 Black’s Law Dictionary defines “Standing” as “[a] party’s right to make a legal

 claim or seek judicial enforcement of a duty or right.” Black’s Law Dictionary (11th

 ed. 2019). The term does not appear in the North Carolina Constitution, nor does it

 appear in the United States Constitution.8 Instead, federal courts have construed

 8 Indeed, the term “standing” is of relatively recent vintage. See Joseph Vining, Legal

 Identity: The Coming of Age of Public Law 55 (1978) (“The word standing is rather recent in
 the basic judicial vocabulary and does not appear to have been commonly used until the
 middle of our own century. No authority that I have found introduces the term with proper
 explanations and apologies and announces that henceforth standing should be used to
 describe who may be heard by a judge. Nor was there any sudden adoption by tacit consent.
 The word appears here and there, spreading very gradually with no discernible pattern.
 Judges and lawyers found themselves using the term and did not ask why they did so or
 where it came from.”). One scholar’s search locates the United States Supreme Court’s first
 use of the term “standing” as an Article III limitation in Stark v. Wickard, 321 U.S. 288
 (1944). See Cass R. Sunstein, What’s Standing After Lujan? Of Citizen Suits, “Injuries,” and
 Article III, 91 Mich. L. Rev. 163, 169 (1992); see also id. (“The explosion of judicial interest in
 standing as a distinct body of constitutional law is an extraordinarily recent phenomenon.”).
 Another scholar identifies the first use of the term in this sense by a justice of that court in
 Coleman v. Miller, 307 U.S. 433, 464-68 (1939) (Frankfurter, J., concurring). See Steven L.
 Winter, The Metaphor of Standing and the Problem of Self-Governance, 40 Stan. L. Rev. 1371,
 1378 (1988).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Article III’s limited extension of federal “Judicial Power” to hear certain categories of

 “Cases” and “Controversies” as giving rise to the standing requirement. U.S. Const.

 Art. III, § 2; See, e.g., Flast v. Cohen, 392 U.S. 83, 94–95 (1968). Thus, at least as a

 matter of federal law, standing, along with other justiciability doctrines, is a

 limitation on the exercise of judicial power.

¶ 17 Article IV of the North Carolina Constitution delineates the State’s judicial

 power as follows:

 The judicial power of the State shall, except as provided in
 Section 3 of this Article, be vested in a Court for the Trial
 of Impeachments and in a General Court of Justice. The
 General Assembly shall have no power to deprive the
 judicial department of any power or jurisdiction that
 rightfully pertains to it as a co-ordinate department of the
 government, nor shall it establish or authorize any courts
 other than as permitted by this Article.

 N.C. Const. Art. IV, § 1. As a matter of textual interpretation, we note this provision

 does not expressly define the term “judicial power.” The provision also does not

 impose any express limitation on the exercise of the judicial power itself, such as the

 “case or controversy” requirement of the United States Constitution. To the contrary,

 the only limitation in the text of the provision protects the judicial power and

 jurisdiction of the courts from intrusion by the General Assembly except by vesting

 administrative agencies with judicial powers reasonably necessary to carry out their

 work under Article IV, Section 3. This provision was not enacted until the North

 Carolina Constitution of 1868, and has been readopted largely intact in subsequent
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 versions since then.9 See N.C. Const. of 1868, art. IV., § 1; N.C. Const. of 1868, art.

 IV, § 1 (1935); N.C. Const. Art. IV, § 1 (1971).

¶ 18 This Court has previously tied another provision of our Constitution to the

 concept of standing: the remedy clause, an aspect of the open courts provision of

 Article I, Section 18, which states “every person for an injury done him in his lands,

 goods, person, or reputation shall have remedy by due course of law[.]” N.C. Const.

 Art. I, § 18; see Mangum v. Raleigh Bd. of Adjustment, 362 N.C. 640, 642 (2008)

 (quoting N.C. Const. Art. I, § 18). A version of this provision was included in the

 Declaration of Rights in 1776, but the current text of the provision was not enacted

 until the 1868 Constitution as well. See N.C. Const. of 1776, Dec. of Rights, § XIII

 (1776); N.C. Const. of 1868, art. I, § 35. While the text of this provision does refer to

 “injury,” the plain meaning of the provision prohibits the use of government power to

 withhold a remedy to an injured party; it does not appear on its face to limit the

 exercise of judicial power to any particular set of circumstances.

¶ 19 If the framers of our Constitution intended any limitation on the exercise of

 judicial power analogous to the standing requirements imposed by the federal

 9 Although the Constitution of 1776 did not include this provision, it did provide for

 the appointment of judges to the “Supreme Court of Law and Equity” by the General
 Assembly, and the Declaration of Rights enacted at that time included the familiar
 constitutional touchstone “[t]hat the legislative, executive, and supreme judicial powers of
 government, ought to be forever separate and distinct from each other.” N.C. Const. of 1776,
 Declaration of Rights, § IV (1776).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 constitution, it is not clear from the plain meaning of the constitutional text.

 Therefore, to determine what the framers meant by “judicial power” and other

 provisions including the remedy clause, in addition to “the text of the constitution,”

 we must examine “the historical context in which the people of North Carolina

 adopted the applicable constitutional provision, and our precedents.” McCrory, 368

 N.C. at 639. We begin with surveying standing at common law before turning to a

 view of standing in federal caselaw and, finally, to our own Constitution and caselaw.

 B. English Common Law History

¶ 20 English common law provides an important touchstone for determining the

 intent of the framers of both the federal and, in many cases, state constitutions.10 “

 ‘It is manifest,’ said the General Assembly of North Carolina in 1715 ‘that the laws

 of England are the laws of this Government, so far as they are compatible with our

 way of living and trade.’ ” State v. Willis, 255 N.C. 473, 474 (1961) (quoting 17 N.C.

 L. Rev. 205). In 1778, in a statute that has continued unaltered since, the General

 Assembly of our newly constituted State adopted the common law:

 All such parts of the common law as were heretofore in
 force and use within this State, or so much of the common
 law as is not destructive of, or repugnant to, or inconsistent
 with, the freedom and independence of this State and the
 form of government therein established, and which has not
 been otherwise provided for in whole or in part, not

 10 We are not the first state supreme court to plough the fields of English common law

 as it pertains to standing under state constitutions. See, e.g., Couey v. Atkins, 357 Or. 460
 (2015).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 abrogated, repealed, or become obsolete, are hereby
 declared to be in full force within this State.

 N.C.G.S. § 4-1 (2019). “The ‘common law’ referred to in N.C.G.S. § 4-1 has been held

 to be the common law of England as of the date of the signing of the American

 Declaration of Independence.” Gwathmey v. State, 342 N.C. 287, 296 (1995). While

 the General Assembly may in general modify or repeal the common law, “any parts

 of the common law which are incorporated in our Constitution may be modified only

 by proper constitutional amendment.” Id. (citing State v. Mitchell, 202 N.C. 439

 (1932)). Thus, while not necessarily dispositive, the common law background is highly

 relevant to discerning the meaning of the constitutional text when it was adopted.

¶ 21 When examining “standing” (as a requirement for a personal stake in

 litigation) under English common law, the first thing one notes is its almost complete

 absence. Instead, “[b]efore and at the time of the framing [of the United States

 Constitution], the English practice was to allow strangers to have standing in the

 many cases involving the ancient prerogative writs.” Cass R. Sunstein, What’s

 Standing After Lujan? Of Citizen Suits, “Injuries,” and Article III, 91 Mich. L. Rev.

 163, 171 (1992) (hereinafter, Standing After Lujan). A “stranger” in this sense means

 “[s]omeone who is not party to a given transaction” or “[o]ne not standing toward

 another in some relation implied in the context,” therefore, one who lacks a personal

 stake in the litigation. “Stranger,” Black’s Law Dictionary (11th ed. 2019). The

 prerogative writs for which courts recognized the authority of strangers to sue to
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 enforce public rights included the writs of certiorari, prohibition, mandamus, and quo

 warranto. See generally Louis L. Jaffe, Standing to Secure Judicial Review: Public

 Actions, 74 Harv. L. Rev. 1265 (1961) (hereinafter Standing to Secure); Raoul Berger,

 Standing to Sue in Public Actions: Is It a Constitutional Requirement?, 78 Yale L.J.

 816 (1969) (hereinafter, Standing to Sue); John L. Winter, The Metaphor of Standing

 and the Problem of Self-Governance, 40 Stan. L. Rev. 1371 (1988) (hereinafter,

 Metaphor).

¶ 22 The extraordinary writs of certiorari 11 and prohibition12 both authorized such

 “stranger suits.” “The English tradition of locus standi in prohibition and certiorari

 is that ‘a stranger’ has standing, but relief in suits by strangers is discretionary. If,

 however, the official’s lack of ‘jurisdiction’ [ ] appeared on the face of the record, relief

 followed as [a matter] of course.” Jaffe, Standing to Secure, 74 Harv. L. Rev. at 1274.

 11 The prerogative writ of certiorari was the antecedent of this Court’s own writ of

 certiorari. See N.C. R. App. P. 21; see also N.C. Const. art. IV, § 12 (“the [Supreme] Court
 may issue any remedial writs necessary to give it general supervision and control over the
 proceedings of the other courts.”). As used by the King’s Bench, however, it had a narrower
 function, generally reviewing the decisions of lower courts only for exceeding their
 jurisdiction in particular cases. Daniel R. Coquillette, The Anglo-American Legal Heritage
 248 (1999). However, the writ was also used to regulate administrative agencies performing
 judicial functions. See Berger, Standing to Sue, 78 Yale L.J. at 821–22.
 12 Prohibition was “[a]n extraordinary writ issued by an appellate court to prevent a

 lower court from exceeding its jurisdiction or to prevent a nonjudicial officer or entity from
 exercising a power.” “Prohibition,” Black’s Law Dictionary (11th ed. 2019). “The writ is so
 ancient that forms of it are given in Glanville . . . , the first book of English law, written in
 the year 1189.” Forrest G. Ferris & Forrest G. Ferris, Jr., The Law of Extraordinary Legal
 Remedies 414–15 (1926). Like the writs of certiorari and mandamus, it persists today. See
 N.C. R. App. P. 22.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 The locus standi rule permitting stranger suits “has been explained on the ground

 that a usurpation of jurisdiction, being an encroachment upon the royal prerogative,

 caused such concern that it made little difference who raised the question.” Id.

¶ 23 First, English courts strongly defended the right of strangers to bring writs of

 prohibition. In a notable example, clergy complained to the king of excessive grants

 of writs of prohibition against ecclesiastical courts. In response, according to Lord

 Coke, “all the judges of England, and the barons of the Exchequer, with one

 unanimous consent,” answered the charges in a seminal document called Articulo

 Cleri. The judges stated as follows in their Third Answer to the complaints:

 Prohibitions by law are to be granted at any time to
 restraine a court to intermeddle with, or execute any thing,
 which by law they ought not to hold plea of, and they are
 much mistaken that maintaine the contrary . . . . And the
 kings courts that may award prohibitions, being informed
 either by the parties themselves, or by any stranger, that
 any court temporall or ecclesiasticall doth hold plea of that
 (whereof they have not jurisdiction) may lawfully prohibit
 the same, as well after judgment and execution, as before.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Edward Coke, 2 Institutes of the Laws of England 602 (1797) (emphasis added).13

 Similarly, the writ of certiorari in English practice could be brought by strangers.14

¶ 24 The prerogative writ of mandamus was also extended to strangers without a

 personal stake. Professor Louis Jaffe has described the writ of mandamus15 as being

 “invented” by Lord Coke, sitting on the King’s Bench, “if not out of whole cloth then

 at least out of a few rags and tatters[.]” Jaffe, Standing to Secure, 74 Harv. L. Rev. at

 1269. In James Bagg’s Case, Lord Coke, reasoning the first assertion of jurisdiction

 through the writ was justified “so that no Wrong or Injury, either Publick or Private,

 can be done, but that it shall be reformed or punished by due Course of Law.” 16 11

 13 Professor Raoul Berger makes the following observation regarding this passage: “No

 English court, so far as I can discover, has ever rejected the authority of Articulo Cleri or
 denied that a writ of prohibition may be granted at the suit of a stranger. On the contrary,
 Coke was cited by the 18th century Abridgments and by English courts throughout the 19th
 century, and his rule remains the law in England today. Thus, at the time of the [American]
 Revolution, the ‘courts in Westminster’ afforded to a stranger a means of attack on
 jurisdictional excesses without requiring a showing of injury to his personal interest.” Berger,
 Standing to Sue, 78 Yale L.J. at 819–20 (footnotes omitted); see also Wadsworth v. Queen of
 Spain, 17 Q.B. 171, 214 (1851) (“[W]e find it laid down in books of the highest authority that,
 where the court to which prohibition is to go has no jurisdiction, a prohibition may be granted
 upon the request of a stranger, as well as of the defendant himself.” (citing 2 Coke 607)).
 14 In Arthur v. Commissioners of Sewers, 88 Eng. Rep. 237 (K.B. 1725), for instance,

 the King’s Bench distinguished between a party with a personal stake and “one who comes
 merely as a stranger,” in determining whether the remedy of a writ of certiorari was
 mandatory or merely discretionary.
 15 Mandamus being then, as now, “[a] writ issued by a court to compel performance of

 a particular act by a lower court or a governmental officer or body[.]” “Mandamus,” Black’s
 Law Dictionary (11th ed. 2019); see Sutton v. Figgatt, 280 N.C. 89, 93 (1971) (“The writ of
 mandamus is an order from a court of competent jurisdiction to a board, corporation, inferior
 court, officer or person commanding the performance of a specified official duty imposed by
 law.”); N.C. R. App. P. 22.
 16 Lord Coke’s rationale for the assertion of jurisdiction through mandamus is, as

 further discussed below, an exposition of Magna Carta that two-and-a-half centuries later
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Coke 93b, 98a, 77 Eng. Rep. 1271, 1278 (K.B. 1615). English cases have long held

 that, in matters of public right, anyone may seek the writ of mandamus to enforce

 the public’s interest.17 See People ex rel. Case v. Collins, 19 Wend. 56, 65-66 (N.Y. Sup.

 Ct. 1837) (collecting English cases in which party obtaining mandamus in name of

 king was a private person without a personal interest); id. at 65 (“It is at least the

 right, if not the duty of every citizen to interfere and see that a public offence be

 properly pursued and punished, and that a public grievance be remedied.”).

¶ 25 The writ for quo warranto also contemplated suit by a stranger.18 See, e.g., Rex

 v. Smith, 100 Eng. Rep. 740 (1790) (discussing Rex v. Brown (1789), in which writ of

 quo warranto was granted despite “it [] not appear[ing that] the party making the

 application ha[d] any connection with the corporation [(a municipal government)]

 because “the ground on which this application is made to enforce a general Act of

 Parliament, which interests all the corporations of the kingdom; and therefore it is

 would become the remedy clause in our Constitution’s Declaration of Rights. Cf. N.C. Const.
 Art. I, § 18 (“every person for an injury done him in his lands, goods, person, or reputation
 shall have remedy by due course of law[.]”).
 17 Professor Jaffe notes “I have encountered no case before 1807 in which the standing

 of plaintiff is mooted, though the lists of the cases in the digest strongly suggest the possibility
 that the plaintiff in some of them was without a personal interest.” Jaffe, Standing to Secure,
 74 Harv. L. Rev. at 1271.
 18 “Quo Warranto,” was “[a] common-law writ used to inquire into the authority by

 which a public office is held or a franchise is claimed.” “Quo Warranto,” Black’s Law
 Dictionary (11th ed. 2019). The writ of quo warranto was ultimately modified by England’s
 Statute of Anne, 9 Anne c. 20 (1710), after which the statutory “information in nature of quo
 warranto” lied instead. See Saunders v. Gatling, 81 N.C. 298, 300 (1879).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 no objection that the party applying is not a member of the corporation.”). See also

 Berger, Standing to Sue, 78 Yale L. J. at 823 (discussing same).

¶ 26 Finally, English law recognized the practice of “informers” and “relators”

 actions, which presaged modern “private attorney general actions.”

 [“Informers” actions] went beyond making available
 procedures to control unlawful conduct, and offered
 financial inducements to strangers to prosecute such
 actions, provided for by a “very large” number of statutes
 “in which the public at large was encouraged to enforce
 obedience to statutes by the promise of a share of the
 penalty imposed for disobedience . . .” Such informers had
 “no interest whatever in the controversy other than that
 given by statute,” and the pecuniary reward thus offered to
 strangers was little calculated to read cognate remedies
 narrowly.

 Berger, Standing to Sue, 78 Yale L. J. at 825–26 (footnotes omitted).19 A “relator”

 action, often for a writ of quo warranto, could be brought by the Attorney General,

 according to Blackstone, “at the relation of any person desiring to prosecute the same,

 (who is then styled the relator). . . .” William Blackstone, 3 Commentaries on the Laws

 of England 264. The relator need have no personal interest in the matter apart from

 the public interest. See, e.g., Rex v. Mayor of Hartford, 91 Eng. Rep. 325 (1700) (quo

 warranto issued against mayor and alderman to show ‘by what authority they

 19 See also Martin v. Trout, 199 U.S. 212, 225 (1905) (“Statutes providing for actions

 by a common informer, who himself had no interest whatever in the controversy other than
 that given by statute, have been in existence hundreds of years in England, and in this
 country ever since the foundation of our government.”).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 admitted persons to be freemen of the corporation who did not inhabit in the borough.

 The motion was pretended to be on behalf of freemen, who by this means were

 encroached upon.” (emphasis added)).

¶ 27 In summary, under English common law practice, which informs our

 interpretation of the intent of the framers of our State’s constitutional text, the

 concept of “standing,” as a personal stake, aggrievement, or injury as a prerequisite

 for litigation brought to vindicate public rights, was basically absent. 20 Instead, the

 English practice included the prerogative writs and informers and relators actions,

 which “took forms astonishingly similar to the ‘standingless’ public action or ‘private

 attorney general’ model that modern standing law is designed to thwart.” Winter,

 Metaphor, 40 Stan. L. Rev. at 1396. To the extent the framers of the North Carolina

 Constitution were informed by the English common law which so suffused the

 development of law in America in crafting our constitutional text, we must conclude

 the use of the term “judicial power” excluded any requirement that there be “actual

 harm” or “injury in fact” apart from the existence of a legal right or cause of action to

 have standing to invoke the power of the courts in this State. This was almost

 certainly the intent of the original framers of the North Carolina Constitution in 1776

 in establishing a “Supreme Court of Justice in Law and Equity” and recognizing a

 20 See Jaffe, Standing to Secure, 74 Harv. L. Rev. at 1270; Berger, Standing to Sue, 78

 Yale L.J. at 827 Winter, Metaphor, 40 Stan. L. Rev. at 1374.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 “judicial power[]” to be preserved “ever separate and distinct” from the legislative and

 executive powers. N.C. Const. of 1776, Declaration of Rights, § IV (1776).

¶ 28 Of course, Article IV of our Constitution which now delineates the judicial

 power is a product of the transformative 1868 Reconstruction convention and the

 most recent reorganization of our Constitution in 1971, along with the major

 amendments in 1935. Therefore, one may object that, whatever the meaning of the

 term as used by colonial lawyers raised on the English common law in 1776, that

 meaning no longer holds today. We therefore examine the law of standing as it

 evolved in America and, in particular, North Carolina to determine if that meaning

 still applies.

 C. The American Experience

¶ 29 In the century following the Revolution, the American states, including North

 Carolina, inherited the English common law of prerogative writs and, in general,

 drew a distinction between writs enforcing private rights, which required a showing

 of legal right or injury (i.e., the existence of a cause of action, as a matter of

 substantive—not constitutional—law), and those enforcing public rights, which could

 be brought by anyone or, at its most restrictive, a citizen or taxpayer. See Couey, 357

 Or. at 496–98 (summarizing the caselaw of the period). Furthermore, in the late-

 nineteenth and early-twentieth centuries state courts, including in North Carolina,
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 began expressing a concern with mootness, not as a constitutional but as a

 discretionary, prudential limitation on judicial power. See id. at 498–99.

¶ 30 One early case reveals the early framers’ conception of the judicial powers of

 this Court, including the power to hear prerogative writs, relative to the English

 courts. In Griffin v. Graham, (1 Hawks) 8 N.C. 96 (1820), this Court, acting in equity,

 heard a complaint from the would-be heirs of a decedent who instead sought to create

 a trust for the establishment of a free school for indigent students. Griffin, 8 N.C. at

 97–99. This Court held the charitable trust was valid and the court had jurisdiction

 to declare it so because, per the reporter’s headnotes,

 though the jurisdiction of charities in England belong[ed]
 to the Court of Chancery, not as a Court of Equity, but as
 administering the prerogative of the Crown, the Court of
 Equity of this state hath the like jurisdiction: for, upon the
 revolution, the political rights and duties of the King
 devolved upon the people in their sovereign capacity; and
 they, by their representatives, have placed this power in
 the Courts of Equity, by the acts of Assembly of 1778, c. 5,
 and 1782, c. 11.

 Griffin, 8 N.C. at 97. Thus, this Court necessarily recognized it inherited the same

 jurisdiction, including the expansive prerogative writs, now in the name of the

 sovereign people rather than the Crown, through the statute now codified at N.C.G.S.

 § 4-1, discussed above. Although the language is not couched in constitutional terms,

 this early decision interpreting the acts of the first session of our General Assembly

 is persuasive evidence of what the framers of our 1776 Constitution believed the
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 content and limits of judicial power to be. Chief Justice Taylor, speaking for a

 majority of the Court, recognized, as a matter of parens patriae, the authority of the

 Court of Chancery in England (and thus, by statutory succession, the Court of Equity

 in North Carolina) to hear an “information for a charitable trust” filed ex officio by

 the Attorney General “at the relation of some informant, where it is necessary.”21 Id.

 at 133 (emphasis added).

¶ 31 Broad access to the prerogative writs for vindication of public rights without a

 showing of personal interest was widely accepted in the nineteenth century. By 1875,

 the United States Supreme Court recognized “[t]here [wa]s . . . a decided

 preponderance of American authority in favor of the doctrine, that private persons

 may move for a [writ of] mandamus to enforce a public duty, not due to the

 government as such, without the intervention of the government law-officer.” Union

 Pac. R. Co. v. Hall, 91 U.S. 343, 355 (1875) (citing many cases from several states).

 21 Although this Court did not address what, if any, interest the relator must have to

 invoke the court’s jurisdiction, William J. Gaston, who would become a justice of this Court,
 was one of the trustees and is reported to have argued before the Court that North Carolina
 law permitted a writ of mandamus filed by a relator in the absence of a personal interest to
 vindicate the public’s interest. 8 N.C. at 124–25 (“It is well settled, that the discretion of the
 trustees does not make it the less a charity: nor does it oppose the right of this Court to
 interfere; for, in all cases of discretionary powers, if they be abused, the Court will interfere,
 and by virtue of its general jurisdiction over trusts, will take the trust out of impure hands,
 and place it in honester. And, upon a bill in the name of the Attorney-General, (and any
 person, however remotely concerned, may be relator,) the Court will compel the trust to act,
 or to assign the trust.”).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 The Supreme Court of Illinois, in one of the cases cited therein, summarized the

 difference between private rights and public rights:

 The question, who shall be the relator . . . depends upon
 the object to be attained by the writ. Where the remedy is
 resorted to for the purpose of enforcing a private right, the
 person interested in having the right enforced, must
 become the relator. . . . A stranger is not permitted
 officiously to interfere, and sue out a mandamus in a
 matter of private concern. But where the object is the
 enforcement of a public right, the People are regarded as
 the real party, and the relator need not show that he has
 any legal interest in the result. It is enough that he is
 interested, as a citizen, in having the laws executed, and
 the right in question enforced.

 Pike Cnty. Comm’rs v. Illinois ex rel. Metz, 11 Ill. 202, 207–08 (1849).

¶ 32 This Court followed the majority trend in recognizing the right of persons

 without any personal interest or injury to pursue actions to vindicate a public right

 throughout the nineteenth century. For instance, this Court, without any further

 showing or discussion of his interest, permitted a plaintiff “as a citizen and taxpayer

 of the state,” to bring an action for mandamus against the secretary of state. Carr v.

 Coke, 116 N.C. 223, 223 (1895).

¶ 33 Another example concerns actions by private relators under section 366 of the

 Code of Civil Procedure of 1868, which, largely following the Statute of Anne,

 abolished the writ of quo warranto and provided a statutory action in the nature of a

 writ of quo warranto for private persons as relator to challenge the wrongful

 occupation of municipal offices in the name of the state, with the permission of the
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

Attorney General. In 1892, this Court heard an action under the statute filed in the

name of the state by a taxpayer and citizen of Greensboro against the appointment

of a police chief, who challenged the suit on the grounds that the relator “d[id] not

allege that he is entitled to the office, nor has any interest in its emoluments, and

therefore is not a proper relator.” State ex rel. Foard v. Hall, 111 N.C. 369, 369 (1892).

This Court held that, under the statute, “[i]t is not necessary that the relator should

have such interest.” Id. This Court reasoned that “In many instances . . . when an

office is illegally held or usurped, there is no one else who can claim a title thereto.

In such cases, unless a voter or taxpayer (not a mere stranger)22 can bring the action

by leave of the attorney general, there would often be no remedy[.]” Id. at 370. Other

cases interpreting the quo warranto statute show that any private person can bring

an action under it and the purpose of the statute is to vindicate public, not private,

rights. See Ellison v. Raleigh, 89 N.C. 125, 132 (1883) (holding the statute “seems to

contemplate the action as one open upon the complaint of any private party[.]”);

Saunders v. Gatling, 81 N.C. 298, 301 (1879) (“It is not merely an action to redress

the grievance of a private person who claims a right to the office, but the public has

 22 Although this Court limited the class of persons who could bring the action to
citizens or taxpayers as opposed to “mere strangers,” this was a matter of statutory, rather
than constitutional, interpretation. This Court later cited Hall in dismissing a complaint
brought by a relator under the statute for failing to allege as a matter of substantive law
under the relevant code section that he was a citizen or taxpayer of the county and thus did
not show he was a “party in interest” under the Code of Civil Procedure. State ex rel. Hines
v. Vann, 118 N.C. 3, 6 (1896) (citing N.C. Code Civ. P. of 1868, § 177).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 an interest in the question which the legislature by these provisions of the code seems

 to have considered paramount to that of the private rights of the persons

 aggrieved[.]”).

¶ 34 These cases demonstrate that in North Carolina, as in a “decided

 preponderance” of states throughout the nineteenth century, see Union Pac. R. Co.,

 91 U.S. at 355, the writ of mandamus and the successor by statute of the writ of quo

 warranto were both broadly available for the vindication of public rights common to

 all citizens and taxpayers, without any required showing of a personal interest. Even

 where such a showing was required, such as where a private right was asserted, it

 was treated as a matter of substantive, not constitutional law.23

 D. Federal Standing Law and the “Case” or “Controversy” Requirement

¶ 35 Before resolving the question at hand under the North Carolina Constitution,

 we must examine the federal law of standing arising under the United States

 23 Standing is not the only modern “justiciability” doctrine not located in the North

 Carolina Constitution in the nineteenth century. For instance, despite the lack of statutory
 or common law authority, this Court at times has approved of courts in equity advising
 trustees as to the discharge of trusts. See, e.g., Simpson v. Wallace, 83 N.C. 477, 479 (1880).
 In certain cases, mootness, too, was regarded, not as a matter of constitutional law, but a
 matter of discretion and prudence. See State ex rel. Martin v. Sloan, 69 N.C. 128, 128 (1873)
 (holding when “neither party has any interest in the case except as to cost[,]” this Court “[is]
 not in the habit of deciding the case.”); State v. Richmond & D.R. Co., 74 N.C. 287, 289 (1876)
 (holding the same). However, this Court expressly held that “[i]f feigned issues ”—those
 collusively brought to test the validity of a law—“ were ever valid in this State, they are
 abolished by the Constitution, Art. 4, § 1.” Blake v. Askew, 76 N.C. 325, 326 (1877).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

Constitution.24 Federal justiciability doctrines—standing, ripeness, mootness, and

the prohibition against advisory opinions—are not explicit within the constitutional

text, but are the fruit of judicial interpretation of Article III’s extension of the “judicial

Power” to certain “Cases” or “Controversies.”25 U.S. Const. art. III, § 2; see

DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341–42 (2006) (“[N]o principle is more

fundamental to the judiciary’s proper role in our system of government than the

constitutional limitation of federal-court jurisdiction to actual cases or controversies.”

(cleaned up)); Arizonans for Official English v. Arizona, 520 U.S. 43, 64 (1997)

(“Standing to sue or defend is an aspect of the case or controversy requirement.”).

Chief Justice Earl Warren, writing for the United States Supreme Court, articulated

the complex role of the federal case or controversy requirement:

 24 One might query whether this digression is necessary. As the law of standing
evolved essentially and originally as a matter of federal law in the twentieth century, and
our courts have on certain occasions turned to federal law to apply standing under our own
laws, we believe it is. See Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.1 (3d ed.
2020) (“As academic as the history may seem, it serves vitally important purposes. Current
standing law is an incredibly rich tapestry woven from all the strands that have been twisted
by the wheels of time. No single approach has become finally dominant; none has gone to
eternal rest. Workaday answers to many specific questions can be found in some areas, but
other questions can be argued and answered only with full knowledge of the intellectual
heritage.”). It is particularly necessary to understand the odd federal “strands twisted” into
the fabric of the law of North Carolina.
 25 The political question doctrine, another justiciability doctrine, has its roots in part

in Article III, but also in the “textually demonstrable constitutional commitment” of certain
questions to the other “political departments” by other parts of the Constitution’s text, see,
e.g., Nixon v. United States, 506 U.S. 224, 229 (1993) (holding nonjusticiable Senate’s
impeachment proceedings due to Article I’s provision that Senate has “sole Power to try all
Impeachments”), and prudential considerations regarding the appropriate role of federal
courts in the federal constitutional schema. See Baker v. Carr, 369 U.S. 186, 217 (1962).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 [T]hose two words have an iceberg quality, containing
 beneath their surface simplicity submerged complexities
 which go to the very heart of our constitutional form of
 government. Embodied in the words ‘cases’ and
 ‘controversies’ are two complementary but somewhat
 different limitations. In part those words limit the business
 of federal courts to questions presented in an adversary
 context and in a form historically viewed as capable of
 resolution through the judicial process. And in part those
 words define the role assigned to the judiciary in a
 tripartite allocation of power to assure that the federal
 courts will not intrude into areas committed to the other
 branches of government. Justiciability is the term of art
 employed to give expression to this dual limitation placed
 upon federal courts by the case and controversy doctrine.

 Flast v. Cohen, 392 U.S. 83, 94–95 (1968). The meaning of these provisions to the

 framers is not described and the only evidence in the records of the Constitutional

 Convention is James Madison’s statement that judicial power ought “to be limited to

 cases of a judiciary nature.”26 As we previously noted, the North Carolina

 Constitution lacks this provision.

¶ 36 The prohibition against advisory opinions by federal courts is, by far, “the

 oldest and most consistent thread in the federal law of justiciability[.]” Wright &

 Miller, 13A Fed. Prac. & Proc. Juris. § 3529.1 (3d ed. 2020). The rule against advisory

 opinions plainly originates in Article III’s case or controversy requirement, as well as

 concerns about separation of powers. Clinton v. Jones, 520 U.S. 681, 700 (1997)

 26 See F. Andrew Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L.

 Rev. 275, 278 (2008) (quoting 2 Records of the Federal Conventions of 1787 at 430 (Max
 Farrand ed., rev. ed. 1966)).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

(“[T]he judicial power to decide cases and controversies does not include the provision

of purely advisory opinions to the Executive, or permit the federal courts to resolve

non justiciable questions.” (footnotes omitted)). The prohibition was first recognized

in the refusal of the Supreme Court to give advice to the Secretary of War and

Congress on pension applications from veterans of the Revolution, in support of which

the Court held “ ‘[N]either the Legislature nor the Executive branches can

constitutionally assign to the judicial any duties, but such as are properly judicial,

and to be performed in a judicial manner.’ ” Hayburn’s Case, 2 U.S. (2 Dall.) 408, 410

n.† (1792) (an unnumbered footnote quoting the circuit court opinion below).

Moreover, in a famous letter submitted in response to Secretary of State Thomas

Jefferson’s request for the Court to advise President Washington on certain questions

about the neutral status of the United States in the French Revolutionary Wars of

1793, Chief Justice John Jay writing for the members of the Court but not as the

Court, emphasized the separation of powers in declining to do so:

 The lines of separation drawn by the Constitution between
 the three departments of the government—their being in
 certain respects checks upon each other—and our being
 judges of a court of the last resort—are considerations
 which afford strong arguments against the propriety of our
 extrajudicially deciding the questions alluded to; especially
 as the power given by the Constitution to the President, of
 calling on the heads of departments for opinions, seems to
 have been purposely as well as expressly united to the
 executive departments.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Letter from Chief Justice John Jay and the Associate Justices to President George

 Washington, August 8, 1793 (cleaned up) (available at

 https://founders.archives.gov/documents/Washington/05-13-02-0263). As an aspect of

 the prohibition against advisory opinions, the Court held it could not hear collusive

 suits, and that exercise of the judicial power required adverse parties. See, e.g., Poe

 v. Ullman, 367 U.S. 497, 505 (1961); United States v. Johnson, 319 U.S. 302, 305

 (1943).

¶ 37 In contrast to the well-established rule against advisory opinions, standing

 doctrine is of comparatively recent origin. See Winter, Metaphor, 40 Stan. L. Rev. at

 1374 (“[A] painstaking search of the historical material demonstrates that—for the

 first 150 years of the Republic—the Framers, the first Congresses, and the Court

 were oblivious to the modern conception either that standing is a component of the

 constitutional phrase ‘cases or controversies’ or that it is a prerequisite for seeking

 governmental compliance with the law.”). As federal standing evolved from a

 requirement that a party have a cause of action to an increasingly restrictive tool

 curbing access to federal courts, the doctrine has been challenged by many scholars

 for inconsistency. See Gene R. Nichol, Jr., Rethinking Standing, 72 Cal. L. Rev. 68,

 68 (1984) (“In perhaps no other area of constitutional law has scholarly commentary

 been so uniformly critical.”). Even the Supreme Court has acknowledged this

 doctrinal confusion. See Valley Forge Christian College v. Americans United for
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Separation of Church & State, Inc., 454 U.S. 464, 475 (1982) (“We need not mince

 words when we say that the concept of ‘Art. III standing” has not been defined with

 complete consistency . . . .”).

¶ 38 From the founding to well into the twentieth century, cases addressing the

 justiciability of parties to maintain a suit turned on whether the party could maintain

 a cause of action. See Sunstein, Standing After Lujan, 91 Mich. L. Rev. at 170. If the

 common law or a statute gave them a cause of action, that was all that was required

 for the case to come within the judicial power. See Osborn v. Bank of the United

 States, 22 U.S. (9 Wheat.) 738, 819 (1824) (“[The judicial] power is capable of acting

 only when the subject is submitted to it, by a party who asserts his rights in the form

 prescribed by law. It then becomes a case, and the constitution declares that the

 judicial power shall extend to all cases arising under the constitution, laws and

 treaties of the United States.”); Winter, Metaphor, 40 Stan. L. Rev. at 1395 (standing

 was contained in the question “whether the matter before it fit one of the recognized

 forms of action.”). As in state courts, federal courts also recognized the right to sue to

 redress public harms without a showing of a particular private interest. One of the

 most notable early cases addressing the justiciability of a case when the party lacked

 a particular interest or injury was Union Pacific Railroad v. Hall, 91 U.S. 343 (1875),

 in which the Supreme Court allowed a mandamus petition brought by merchants

 under a general mandamus statute to compel a chartered railroad to build a railroad
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 line. The Supreme Court recognized the merchants attempted to enforce “a duty to

 the public generally” and they “had no interest other than such as belonged to others.”

 Id. at 354. The ultimate question—“whether a writ of mandamus to compel the

 performance of a public duty may be issued at the instance of a private relator”

 without a “special injury”—was answered in the affirmative. Id. at 354. The existence

 of the right to bring an action for mandamus under the statute, confirmed by the

 Court’s examination of the widespread acceptance of public actions without particular

 injuries in America, settled the question; the Court raised no issue of an additional

 showing of a “peculiar and special” injury being required as a matter of constitutional

 law. Id. at 355. Moreover, the existence since the first Congress of federal qui tam

 and informer’s actions that permitted individuals to file suit without a personal

 interest support the view that Article III was not understood to impose any greater

 requirement for injury or a personal interest where a congressional act created a

 cause of action. See Sunstein, Standing After Lujan, 91 Mich. L. Rev. at 176–77.

¶ 39 Standing doctrine as a distinct constitutional requirement under Article III

 first arose in the middle part of the twentieth century, largely at the hands of Justices

 Brandeis and, later, Frankfurter, partially in response to the emergence of the

 administrative state and constitutional attacks on progressive federal legislative

 programs. See Sunstein, Standing After Lujan, 91 Mich. L. Rev. at 179; F. Andrew

 Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L. Rev. 275, 276
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

(2008).27 These cases primarily involved constitutional challenges to legislative

enactments and government action without a common law cause of action or one

arising under a statute. Importantly, in most of the cases, there was also no clear

right created in the federal constitution that did not run to the public at large. See,

e.g., Frothingham v. Mellon, 262 U.S. 447, 488 (1923) (Tenth Amendment challenge);

Ex Parte Levitt, 302 U.S. 633, 633 (1937) (challenge alleged violation of Article I, § 6).

The cases of this period, although not until later explicitly defining the inquiry in

terms of “standing,” were consistent with the longstanding concern only that the

plaintiff show some right under common law, a statutory source, or the constitution.28

See, e.g., Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 159 (1951)

 27 As several commentators have noted, in a pair of decisions, Justice Frankfurter

attempted to ground the new standing requirements in the historical practice of the “courts
at Westminster,” even though these requirements are essentially inconsistent with the
history summarized above. See, e.g., Sunstein, Standing After Lujan, 91 Mich. L. Rev. at 172;
Winter, Metaphor, 40 Stan. L. Rev. at 1394–95; Berger, Standing to Sue, 78 Yale L.J. at 816.
For an empirical review of Supreme Court decisions by parts validating and criticizing the
claimed impact of liberal justices, including Justices Brandeis and Frankfurter, in this early
period, see generally Daniel E. Ho & Erica L. Ross, Did Liberal Justices Invent the Standing
Doctrine? An Empirical Study of the Evolution of Standing, 1921-2006, 62 Stan. L. Rev. 591
(2010).
 28 Although as Professor Sunstein notes the direct cause of action arising under the

constitution recognized in Bivens v. Six Unknown Named Agents of Federal Bureau of
Narcotics, 403 U.S. 388 (1971), was still a long way off, Sunstein, Standing After Lujan, 91
Mich. L. Rev. at 180, as Professor Andrew Hessick notes, early in this period the Supreme
Court recognized there was standing arising directly under the Fourteenth Amendment in
Pierce v. Society of Sisters, 268 U.S. 510, 535–36 (1925). See Hessick, Standing, Injury in
Fact, and Private Rights, 93 Cornell L. Rev. at 291, n.97. For our purposes, the relevance of
Pierce is that the plaintiffs’ standing to sue was recognized where there was a right under
the constitution.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 (Frankfurter, J., concurring) (“Only on the ground that the organizations assert no

 interest protected in analogous situations at common law, by statute, or by the

 Constitution, therefore, can plausible challenge to their ‘standing’ here be made.”). In

 the absence of such a “legal right,” factual injury was insufficient. See Tennessee Elec.

 Power Co. v. Tennessee Val. Authority, 306 U.S. 118, 137–38 (1939).

¶ 40 In the most notable case of this period, Frothingham v. Mellon, 262 U.S. 447

 (1923), the Supreme Court held a person may not sue only as a federal taxpayer who

 shares a grievance in common with all other federal taxpayers.29 In Frothingham, the

 plaintiff sued as a federal taxpayer seeking to restrain the expenditure of federal

 funds on grants to the states through the Maternity Act of 1921 by arguing it violated

 the Tenth Amendment reservation of powers to the states. Id. at 486. The Supreme

 Court rejected the challenge. In holding the plaintiff’s suit could not be maintained,

 the Court first held the plaintiff could not avail herself of the equitable powers of the

 federal courts because, as opposed to a taxpayer of a municipality, her “interest in

 the moneys of the [federal] treasury . . . is comparatively minute and

 indeterminable,” and, therefore, obtaining an injunction as a remedy is inappropriate

 Id. at 487. The Court suggested that concerns about administrability and separation

 29 The Supreme Court’s first dismissal under this rationale was decided a year before

 in an opinion authored by Justice Brandeis. See Fairchild v. Hughes, 258 U.S. 126 (1922)
 (“Plaintiffs alleged interest [as a taxpayer] in the question submitted is not such as to afford
 a basis for this proceeding.”). See Winter, Metaphor, 40 Stan. L.R. at 1376.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 of powers informed its decision on the exercise of courts’ equitable power. Id. at 487

 (“If one taxpayer may champion and litigate such a cause, then every other taxpayer

 may do the same, not only in respect of the statute here under review, but also in

 respect of every other appropriation act and statute whose administration requires

 the outlay of public money, and whose validity may be questioned.”). The Court

 provided a further rationale: it “ha[s] no power per se” of judicial review, but “[t]hat

 question may be considered only when the justification for some direct injury suffered

 or threatened, presenting a justiciable issue, is made to rest upon such an act.” Id. at

 488. Thus “[t]he party who invokes the power must be able to show, not only that the

 statute is invalid, but that he has sustained or is immediately in danger of sustaining

 some direct injury as the result of its enforcement, and not merely that he suffers in

 some indefinite way in common with people generally.” Id.

¶ 41 While Frothingham first explained the prohibition against taxpayer standing,

 Ex parte Levitt, 302 U.S. 633 (1937), announced the prohibition against citizen

 standing. In Levitt, the plaintiff sued “as a citizen and a member of the bar of [the

 United States Supreme] Court” challenging the appointment of Justice Hugo Black

 as an Associate Justice of the Supreme Court arguing that, as a sitting United States

 Senator, he was ineligible under Article I, § 6.30 302 U.S. 635–36. The Supreme Court

 30 The clause in question provides that “No Senator or Representative shall, during

 the Time for which he was elected, be appointed to any civil Office under the Authority of the
 United States, which . . . the Emoluments whereof shall have been [i]ncreased during such
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 held, citing Frothingham and other cases involving third-party standing, “[i]t is an

 established principle that to entitle a private individual to invoke the judicial power

 to determine the validity of executive or legislative action he must show that he has

 sustained, or is immediately in danger of sustaining, a direct injury as the result of

 that action and it is not sufficient that he has merely a general interest common to

 all members of the public.” Id. at 636.

¶ 42 Taken together, Frothingham and Levitt establish a general prohibition

 against “generalized grievances”—in which the plaintiff alleges only an injury he

 shares in common with all other taxpayers or citizens and alleges no direct injury—

 to challenge the constitutionality of legislative or executive action in federal court.

 Some have contended Frothingham’s prohibition on taxpayer standing and its

 reasoning is “prudential”—that is, it is a product of judicial self-restraint—while

 others contend it is constitutional and a product of the case or controversy

 requirement.31 Indeed, even one of the progenitors of modern standing, Justice

 Brandeis, conceived of it as a prudential, not jurisdictional limitation.32 See

 time.” U.S. Const. art. I, § 6, cl.2. The salaries of the Supreme Court had been raised while
 Justice Black served as Senator.
 31 Professor Jaffe, for instance, contended Frothingham can be reconciled with the

 history of ‘standingless’ public actions in that it “can rest on the ground that until Congress
 decides otherwise, there is no need for a generally available federal taxpayer’s action.” Louis
 L. Jaffe, Standing to Secure Judicial Review: Private Actions, 75 Harv. L. Rev. 255, 303
 (1961).
 32 Whether a standing requirement such as the prohibition against generalized

 grievances and attendant requirement for “direct injury” is prudential or jurisdictional may
 seem academic, but it is a vital distinction. If a limitation is adopted as an exercise in
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346, 346–48 (1936) (Brandeis, J.,

 concurring) (holding that “[t]he court will not pass upon the validity of a statute upon

 complaint of one who fails to show that he is injured by its operation[,]” is a rule of

 constitutional avoidance the Supreme Court developed “for its own governance in the

 cases confessedly within its jurisdiction.” (citing Mellon, 262 U.S. 447) (emphasis

 added)).

¶ 43 An important development in the law of standing happened in the middle of

 the twentieth century when the federal Administrative Procedure Act (APA) was

 enacted in 1946. In an important provision, the APA provided “A person suffering

 legal wrong because of agency action, or adversely affected or aggrieved by agency

 action within the meaning of a relevant statute, is entitled to judicial review thereof.”

 5 U.S.C. § 702 (2018). The “legal wrong” prong authorized suits based on invasion of

 common law interests or invasion or disregard of interests protected by a governing

 statute. See Sunstein, Standing after Lujan, 91 Mich. L. Rev. at 181–82; id. at 182,

 n.94 (“[T]he key point is that the APA did not require an explicit grant, but instead

 inferred a cause of action (standing) from the existence of an interest that the agency

 was entitled to consider.”). The second prong, creating a statutory cause of action for

 persons “adversely affected or aggrieved by agency action within the meaning of a

 prudential self-restraint by the judiciary, Congress (or the legislature) may enact a statute
 conferring standing on persons in cases the courts would otherwise decline to hear.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 relevant statute” served to confer standing on persons as private attorneys general.

 The Court had previously interpreted an analogous provision of the Communications

 Act of 1934 to give standing to persons “only as representatives of the public interest.”

 Scripps-Howard Radio v. F.C.C., 316 U.S. 4, 14 (1942).

¶ 44 Beginning in the early 1960s, the Supreme Court under Chief Justice Earl

 Warren, perhaps recognizing the restrictiveness of its standing decisions, applied a

 “pragmatic and functional strain” of standing doctrine. Wright & Miller, 13A Fed.

 Prac. & Proc. Juris. § 3531.1 (3d ed. 2020); See Sunstein, Standing After Lujan, 91

 Mich. L. Rev. at 183–84 ; Hessick, Standing, Injury in Fact, and Private Rights, 93

 Cornell L. Rev. at 292–93. After Frothingham and Levitt, the first Supreme Court

 decision to address standing again in detail was Baker v. Carr, 369 U.S. 186 (1962).

 In Baker, the Supreme Court held that citizens who suffered vote dilution based on

 malapportionment had standing to sue under the Equal Protection Clause. See id. at

 207 (“A citizen’s right to a vote free of arbitrary impairment by state action has been

 judicially recognized as aright secured by the Constitution[.]”). In support of its

 holding, the Supreme Court articulated a rationale that has become a “refrain” if not

 a “shibboleth” in standing decisions, Nichol, Rethinking Standing, 72 Cal. L. Rev. at

 71, including our own:

 A federal court cannot “pronounce any statute, either of a
 state or of the United States, void, because irreconcilable
 with the constitution, except as it is called upon to adjudge
 the legal rights of litigants in actual controversies.” Have
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 the appellants alleged such a personal stake in the outcome
 of the controversy as to assure that concrete adverseness
 which sharpens the presentation of issues upon which the
 court so largely depends for illumination of difficult
 constitutional questions? This is the gist of the question of
 standing.

 Baker, 369 U.S. at 205 (citation omitted) (quoting Liverpool, N.Y. & P. Steamship Co.

 v. Comm’rs of Emigration, 113 U.S. 33, 39 (1885)).

¶ 45 Notably, the Supreme Court rested its decision not on any recent standing

 case, including Frothingham or Levitt, but instead on the old principle requiring an

 “actual controversy,” or, in the Baker Court’s term, “concrete adverseness.” In

 Liverpool, N.Y. & P. Steamship, the Court noted that it would not pass upon the

 constitutionality of acts of Congress “as an abstract question” because “[t]hat is not

 the mode in which this court is accustomed or willing to consider such questions.”

 Liverpool, N.Y. & P. Steamship, 113 U.S. at 39. Although it described the requirement

 for an “actual controvers[y]” was “jurisdictional,” it reasoned that “in the exercise of

 that jurisdiction,” it is bound by rules that are essentially functional and prudential.

 See id. (holding the court is bound by rules of constitutional avoidance as “safe guides

 to sound judgment” and “[i]t is the dictate of wisdom to follow them closely and

 carefully”).

¶ 46 Besides the overarching rationale that standing is predicated on a prudential

 concern for sharpening legal issues, nowhere does the Baker opinion suggest a need

 for “injury in fact.” To the contrary, the only injury asserted is the impairment of a
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 constitutional right broadly shared and divorced from any “factual” harm experienced

 by the plaintiffs. See Winter, Metaphor, 40 Stan. L. Rev. at 1380 (describing the

 “voter’s interest in the relative weight of his or her vote” at issue in Baker as “a matter

 that is a purely legal construct dependent on one’s conceptualization of a properly

 weighted vote”).

¶ 47 Toward the end of the Warren era, the Supreme Court again addressed

 standing in the context of a taxpayer suit, attempting to resolve the dispute generated

 by Frothingham about whether the prohibition against federal taxpayer standing was

 an absolute constitutional bar or a prudential concern. In Flast v. Cohen, 392 U.S. 83

 (1968), the Court seemingly reversed course on Frothingham, and held that federal

 income taxpayers had standing to challenge the use of federal funds to support

 instructional activities and materials in religious schools. Id. at 88. In support of this

 holding, Chief Justice Warren, writing for the Court, turned toward Baker’s

 functional approach rather than Frothingham’s concern with separation of powers:

 The question whether a particular person is a proper party
 to maintain the action does not, by its own force, raise
 separation of powers problems related to improper judicial
 interference in areas committed to other branches of the
 Federal Government. Such problems arise, if at all, only
 from the substantive issues the individual seeks to have
 adjudicated. Thus, in terms of Article III limitations on
 federal court jurisdiction, the question of standing is
 related only to whether the dispute sought to be
 adjudicated will be presented in an adversary context and
 in a form historically viewed as capable of judicial
 resolution. It is for that reason that the emphasis in
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 standing problems is on whether the party invoking federal
 court jurisdiction has “a personal stake in the outcome of
 the controversy,” . . . and whether the dispute touches
 upon “the legal relations of parties having adverse legal
 interests.”

 Id. at 100–01 (quoting Baker, 369 U.S. at 205). After announcing these broad

 principles, the Court introduced a test to determine whether there was sufficient

 personal stake in a taxpayer standing suit by requiring “a logical nexus between the

 status asserted and the claim sought to be adjudicated.” Id. at 102. In the context of

 a taxpayer suit, the taxpayer must show the challenged statute was an exercise of

 Congress’s power to tax and spend under Article I, § 8, and, if so, that the challenged

 enactment violates specific constitutional limitations on that power. In Flast, the

 Court held the expenditures were a result of the spending power and the

 Establishment Clause specifically limited the exercise of that power. Thus, there was

 standing. In contrast, the Court held, Frothingham lacked such a nexus.

¶ 48 The “nexus test” announced in Flast has been much-criticized.33 Subsequently,

 the Court has essentially confined its scope to analysis of taxpayer standing claims

 under the taxing and spending power of Article I, § 8. For our purposes, Flast is

 relevant for cementing the ‘pragmatic and functional strain’ of Baker’s requirement

 for “concrete adverseness” and a sufficiently “personal stake in the outcome of the

 33 See, e.g., United States v. Richardson, 418 U.S. at 182 (Powell, J., concurring) (“[I]t

 is impossible to see how an inquiry about the existence of ‘concrete adverseness’ is furthered
 by the application of the Flast test.”).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 controversy,” and also for significantly limiting the apparently broad scope of

 Frothingham’s prohibition against federal taxpayer standing in constitutional

 litigation.

¶ 49 While Baker and Flast involved rights arising directly under the constitution,

 this era also saw an expansion in standing based on rights created by statute. There

 was, of course, general acceptance that an express conferral of standing by Congress

 created a right to sue. See McGrath, 341 U.S. at 151–53 (Frankfurter, J., concurring).

 This included private attorney general actions where the plaintiff alleged no personal

 interest of their own besides the right to sue created by the statute. See, e.g., Scripps-

 Howard Radio, 316 U.S. at 14 (recognizing that Congress permits litigants “standing

 only as representatives of the public interest.”). Furthermore, the objects of

 statutes—that is, those regulated, as distinguished from the beneficiaries of such

 regulation—had standing under the APA where they had a personal interest at stake

 that was protected by the statute. See Sunstein, Standing After Lujan, 91 Mich. L.

 Rev. at 182 (“People could bring suit if they could show that ‘a relevant

 statute’ . . . granted them standing by providing that people ‘adversely affected or

 aggrieved’ were entitled to bring suit. In this way, the APA recognized that Congress

 had allowed people to have causes of action, and hence standing, even if their

 interests were not entitled to consideration by the relevant agency.” (footnote

 omitted)). In the decade following Flast courts went further, concluding that the
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 beneficiaries of regulatory programs, as well as their objects, had standing to sue to

 challenge government action—as well as administrative inaction. See id. at 183

 (citing cases from 1960 through 1975 where “courts concluded that displaced urban

 residents, listeners of radio stations, and users of the environment could proceed

 against the government to redress an agency’s legally insufficient regulatory

 protection”). The “legal interest” test, which was exemplified by Justice Frankfurter’s

 concurrence in McGrath, under which plaintiffs had standing if they suffered

 infringement of a right at common law, by statute, or under the constitution,

 McGrath, 341 U.S. at 151–53 (Frankfurter, J., concurring), was thus “read to allow

 standing for beneficiaries, who often faced statutory harm—‘legal injury’—by virtue

 of inadequate regulatory action.” Sunstein, Standing After Lujan, 91 Mich. L. Rev. at

 184; see Hardin v. Kentucky Utilities Co., 390 U.S. 1 (1968) (holding that “no explicit

 statutory provision [was] necessary to confer standing,” since the private utility

 bringing suit was “in the class which [the statute was] designed to protect”); Louis L.

 Jaffe, Standing Again, 84 Harv. L. Rev. 633, 633 (1972).

¶ 50 However, the Court did not stop with expanding the legal interest test. Nor did

 it decide that a private person could challenge any alleged violation of the public

 interest. Instead, in Association of Data Processing Service Organizations, Inc. v.

 Camp, 397 U.S. 150 (1970), the Supreme Court abandoned the legal interest test,

 distinguishing it by reasoning that it “goes to the merits,” and unanimously held for
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

the first time that a plaintiff could challenge a government action by alleging “injury

in fact.” 397 U.S. at 152–53. The factual injury could, but need not be, economic. See

id. at 152. In particular, the court recognized that “aesthetic, conservational, and

recreational” interests, or even “a spiritual stake” could support standing under the

“injury in fact” test. Id. at 154 (citations omitted); see also Gene R. Nichol, Jr., Injury

and the Disintegration of Article III, 74 Cal. L. Rev. 1915, 1921 (1986) (identifying

cases in which the Supreme Court subsequently recognized these injuries, as well as

other nontraditional injuries). Plainly the injury-in-fact test was intended to expand

standing to new categories of plaintiffs beyond that conferred by the legal interest

test. See Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 39

(1976) (“Reduction of the threshold requirement to actual injury redressable by the

court represented a substantial broadening of access to the federal courts over that

previously thought to be the constitutional minimum under [the APA].”). This

expansion soon presented problems, however. See Nichol, Rethinking Standing, 72

Cal. L. Rev. at 75 (noting that, in some cases, injury-in-fact-test relied on injuries

“that were not only intangible, but also subjective” and, in others, could not be

separated from legal interests). Although Data Processing intended to expand

standing, not restrict it, Data Processing’s injury-in-fact test paved the way for the

restriction of standing to come. See Laurence H. Tribe, 1 American Constitutional

Law 394 (3d ed. 2000) (“By decoupling standing from questions of substantive law,
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 the Data Processing Court sowed the initial seeds of doubt regarding Congress’ power

 to create standing where private rights were not infringed.”).

¶ 51 The attempt to expand standing under the injury-in-fact test announced in

 Data Processing and the adoption of a pragmatic and functional approach to the

 question in Baker and Flast soon gave way to doctrinal change that tightened

 standing requirements and limited access to federal courts in the Burger era. In a

 series of cases addressing constitutional challenges to legislation, the Supreme Court

 reversed course on the pragmatic approach to standing, grounding it instead in

 separation of powers—a view it had expressly rejected in the prior era. See Flast, 392

 U.S. at 100 (“[W]hether a particular person is a proper party to maintain the action

 does not, by its own force, raise separation of powers problems.”).

¶ 52 In a pair of decisions handed down the same day, the Court held there was no

 standing in a case alleging the failure to publish the CIA’s budget violated Article I,

 § 9, or in a challenge to the ability of members of Congress to simultaneously serve

 in the Armed Forces Reserve under the incompatibility clause of Article I, § 6, cl. 2.

 United States v. Richardson, 418 U.S. 166 (1974); Schlesinger v. Reservists Comm. to

 Stop the War, 418 U.S. 208 (1974). In Schlesinger, the Court held a plaintiff cannot

 rely on citizen standing if his interest is “ ‘undifferentiated’ from that of all other

 citizens.” Id. at 217. While the Court in part defended this position in terms of Baker’s

 need for a personal stake to ensure adversary presentation, the decision primarily
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

turned on separation-of-powers concerns, noting that since “every provision of the

Constitution was meant to serve the interests of all,” and permitting standing under

all constitutional provisions would “ha[ve] no boundaries” and ultimately “distort the

role of the Judiciary in its relationship to the Executive and the Legislature . . . .” Id.

at 226–27, 222. Similarly, in Richardson, the Court held there was no citizen or

taxpayer standing to challenge legislation shielding the CIA budget from public

disclosure under the Statement and Account Clause, U.S. Const. art. I, sec. 9, cl. 7.

Richardson, 418 U.S. at 175. In his concurrence, Justice Powell reasoned that

“taxpayer or citizen advocacy, given its potentially broad base, is precisely the type of

leverage that in a democracy ought to be employed against the branches that were

intended to be responsive to public attitudes.” Id. at 189 (Powell, J., concurring).

Richardson, too, tightened taxpayer and citizen standing based primarily on

separation-of-powers grounds. Finally, in Valley Forge, the Court nevertheless found

no standing for a taxpayer challenging the federal government transfer of public

property to a religious institution under the Establishment Clause, distinguishing it

from Flast on the grounds that it was executive not legislative action, thus cabining

the conceivably broad access to taxpayer standing under Flast. Valley Forge Christian

College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464

(1982).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

¶ 53 These cases reaffirm and extend the prohibition against generalized

 grievances, making clear that “undifferentiated” or “abstract” rights under the

 constitution were not sufficient to confer standing. Moreover, the Court continued to

 change course on its earlier expansion of standing, emphasizing that the federal law

 of standing was based not primarily on functional concerns about the adversary

 presentation of the dispute, as indicated in Baker and Flast, but separation of powers,

 see Allen v. Wright, 468 U.S. 737, 752 (1984), and federalism, see Los Angeles v. Lyons,

 461 U.S. 102, 112 (1983).

 E. Lujan and “Injury in Fact” to Date

¶ 54 In 1992, with an opinion written by Justice Scalia, the Supreme Court

 dramatically altered the law of standing in Lujan v. Defenders of Wildlife, 504 U.S.

 555 (1992), when the Court held for the first time that plaintiffs had no standing to

 bring suit under a congressional statute authorizing suit because they lacked “injury

 in fact.” The plaintiffs had sued under the Endangered Species Act (ESA). Section 7

 of the ESA requires the Secretary of the Interior to consult with other agencies when

 agency projects threaten the existence of endangered plants and animals. 16 U.S.C.

 § 1536(a)(2) (2018). The Interior Department had originally construed that statute to

 apply to actions within the United States, on the high seas, or in foreign nations.

 Lujan, 504 U.S. at 558. The agency reexamined its position and ultimately issued a

 new regulation interpreting the statute to require consultation only for actions taken
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 in the United States or on the high seas, not in foreign nations. Id. at 558–59. The

 plaintiffs, wildlife conservation organizations, challenged the new regulation as

 wrongly interpreting the statute.

¶ 55 In its decision, the Court announced the test for standing that remains the law

 of standing at the federal level today, that as an “irreducible constitutional minimum”

 standing requires three elements:

 First, the plaintiff must have suffered an “injury in fact”—
 an invasion of a legally protected interest which is (a)
 concrete and particularized and (b) “actual or imminent,
 not ‘conjectural’ or ‘hypothetical.’ ” Second, there must be a
 causal connection between the injury and the conduct
 complained of—the injury has to be “fairly . . . trace[able]
 to the challenged action of the defendant, and not . . . th[e]
 result [of] the independent action of some third party not
 before the court.” Third, it must be “likely,” as opposed to
 merely “speculative,” that the injury will be “redressed by
 a favorable decision.”

 Id. at 560–61 (citations omitted) (alterations in original). The Court applied this test

 and held the plaintiffs had failed to allege adequate “injury in fact.” Although the

 parties had a “cognizable interest” in “the desire to use or observe an animal species,”

 the particular plaintiffs (here, one or more of the organizations’ members) would not

 be “ ‘directly’ affected apart from their ‘ “special interest” in the subject.’ ” Id. at 563

 (citations omitted). The Eighth Circuit Court of Appeals below had nevertheless held

 there was standing based upon the ESA’s “citizen-suit” provision granting “any

 person” a right to sue to enforce the statute. Id. at 571–72 (quoting 16 U.S.C.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 § 1540(g)). The Supreme Court rejected this rationale, however, concluding that the

 interest conferred by the statute was merely a “conferral upon all persons of an

 abstract, self-contained, noninstrumental ‘right’ ,” id. at 573, and that it was merely

 a “generalized grievance,” id. at 575. The Court summarized the generalized

 grievance caselaw including Frothingham, Levitt, Richardson, Schlesinger, and

 Valley Forge34 and applied the prohibition for the first time to bar standing for a claim

 that arose not under the Constitution, like every generalized grievance case before,

 but under a statutory cause of action created by Congress. Recognizing this novel

 path, the Court noted that “there is absolutely no basis for making the Article III

 inquiry turn on the source of the asserted right,” and to do so “would be

 discarding . . . one of the essential elements that identifies those ‘Cases’ and

 ‘Controversies’ that are the business of the courts. . . .” Id. at 576. Thus, on the basis

 of the Case or Controversy requirement, the Court held plaintiffs lacked standing to

 sue in an action to vindicate the public interest in the effective enforcement of laws

 even where Congress expressly conferred standing to sue.

¶ 56 Criticism of Lujan and the injury-in-fact requirement more broadly has been

 widespread. First, it has been criticized most harshly for its inconsistency with the

 original meaning of the case or controversy requirement of Article III and, in

 particular, the long history in England and the United States of public actions

 34 Although, notably, Flast was not discussed.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

brought by private plaintiffs, including those authorized under a statute, as

summarized above. See generally Sunstein, Standing After Lujan, 91 Mich. L. Rev.

163; Gene R. Nichol, Jr., Justice Scalia, Standing, and Public Law Litigation, 42

Duke L.J. 1141, 1151–53 (1993). Second, the injury-in-fact test, which was introduced

in Data Processing to expand access to the courts, was, according to the critics,

perversely used instead to foreclose access to the judiciary under many statutory

“citizen-action” provisions. Third, critics argue that despite its occasional statements

to the contrary, in turning to “injury in fact,” the Court has undermined the

separation of powers by invading the power of the legislature to create rights. See

Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L. Rev. 275 at 320–-

21. Most strikingly, critics argue that the rule in Lujan could be applied to limit even

indisputably private rights of action created by statute.35 Fifth, despite reflecting an

attempt to objectify the law and separate standing analysis from a decision on the

merits, the critics argue that the injury-in-fact test essentially imports assessment of

the merits of the claim into the analysis sub rosa. Nichol, Rethinking Standing, 72

Cal. L. Rev. at 78. Finally, the critics argue that original concerns motivating

standing doctrine—ensuring sufficient “concrete adverseness” to ensure efficient

 35 See Spokeo, 136 S. Ct. at 1549, 194 L. Ed. 2d at 635 (“Congress’ role in identifying

and elevating intangible harms does not mean that a plaintiff automatically satisfies the
injury-in-fact requirement whenever a statute grants a person a statutory right and purports
to authorize that person to sue to vindicate that right.”).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 resolution of disputes—does not necessitate and is arguably impaired by the injury

 in fact requirement.36

¶ 57 In summary, the very notion of a standing requirement under Article III only

 arose in the twentieth century. For most of our nation’s history, federal law permitted

 standing for private citizens in public actions even in the absence of any

 particularized injury requirement. For most of the twentieth century, standing

 existed where there was invasion of a legal right under the common law, a statute, or

 the Constitution. The Supreme Court long emphasized a functional and pragmatic

 approach to the question of standing, focused on “concrete adverseness,” generally

 limiting this concern to constitutional questions, and significantly expanded the

 categories of claims that could support standing. However, that expansion was

 reversed, first in the context of taxpayer and citizen suits and, later with the adoption

 of an “injury in fact” requirement, which has been increasingly used to constrain

 access to federal courts even where a statute creates a right to sue. Ultimately the

 Court adopted a restrictive interpretation of injury-in-fact that applied its

 substantially tightened requirements for standing to attack the constitutionality of

 36 Notably, the Supreme Court has largely jettisoned Baker’s concrete adverseness

 rationale. See Lewis v. Casey, 518 U.S. 343, 353 n.3 (1996) (noting standing doctrine “has a
 separation of powers component, which keeps courts within certain traditional bounds vis-à-
 vis the other branches, concrete adverseness or not. That is where the ‘actual injury’
 requirement comes from”).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 acts of the other branches based on taxpayer or citizen standing beyond that context

 to rights actually created by Congress.

 F. Standing Under North Carolina Law

¶ 58 We must now determine whether our North Carolina Constitution, specifically

 the “judicial power” provisions of Article IV, §§ 1 and 2, imposes a requirement for

 “standing,” as well as a requirement for “injury-in-fact,” to bring suit under a cause

 of action which the General Assembly has expressly created. As an initial matter, we

 have held that our Constitution, unlike the federal constitution, “is in no matter a

 grant of power. All power which is not limited by the Constitution inheres in the

 people . . . .” McIntyre v. Clarkson, 254 N.C. 510, 515 (1961) (quoting Lassiter v.

 Northampton Cty. Bd. of Elections, 248 N.C. 102, 112 (1958)). Judicial power under

 the state constitution is, therefore, plenary, and “[e]xcept as expressly limited by the

 constitution, the inherent power of the judicial branch of government continues.” 37

 Beard v. North Carolina State Bar, 320 N.C. 126, 129 (1987); see generally State v.

 Lewis, 142 N.C. 626 (1906). While the federal constitution limits the federal “judicial

 Power” to certain “Cases” and “Controversies.” U.S. Const. Art. III, § 2, our

 Constitution, in contrast, has no such case or controversy limitation to the “judicial

 37 Other states have recognized the “plenary” nature of their judicial power under

 state constitutions. See, e.g., Couey, 357 Or. at 502, 355 P.3d at 891; Borrego v. Territory, 8
 N.M. 446, 495 (1896) (“judicial power . . . is thus vested in plenary terms”); Floyd v. Quinn,
 24 R.I. 147, 149 (1902) (“[T]he vesting of the judicial power is plenary and exclusive.”).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 power.” Because the federal concept of standing is textually grounded in terms which

 are not present in the North Carolina Constitution, we see that the framers of the

 North Carolina Constitution did not, by their plain words, incorporate the same

 federal standing requirements. See Goldston v. State, 316 N.C. 26, 35 (2006) (holding

 North Carolina standing doctrine is “not coincident with federal standing doctrine”).

 Thus, any limitation on the judicial power in the North Carolina Constitution must

 inhere in the phrase “judicial power” itself.

 1. Does the North Carolina Constitution Impose an “Injury-in-Fact”
 Requirement Under the “Judicial Power” Provision?

¶ 59 As noted, throughout the nineteenth century, the words “judicial power” in our

 Constitution imposed no limitation on standing. Since 1776, North Carolina law

 contemplated that the writ of mandamus and an action in the nature of the writ of

 quo warranto were available without any showing of a personal stake in the litigation,

 continuing a legacy that originated in the earliest days of the common law. Against

 this backdrop, we conclude that neither the framers of the 1776 Constitution, which

 recognized a judicial power to be kept “forever separate and distinct,” nor of the 1868

 Constitution, which originated our present “judicial power” in its own Article,

 imposed a requirement of particular injury beyond a legal right at common law, by

 statute, or under the constitution itself. The only case we have identified in the

 nineteenth century imposing a standing-type justiciability doctrine as a

 constitutional requirement was the prohibition against collusive suits. See Blake v.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 Askew, 76 N.C. at 326 (“If they were ever valid in this State, feigned issues are

 abolished by the Constitution, Art. 4, § 1.”).

¶ 60 Concerns about standing under North Carolina law arose in the context of suits

 to enjoin legislation for violating the constitution; rather than in preventing parties

 from getting in the courthouse door, these concerns addressed what arguments

 parties may lodge once there. In St. George v. Hardie, 147 N.C. 88 (1908), for instance,

 a licensed boat pilot for hire, who was licensed by a licensing board regulating

 pilotage on the Cape Fear River, sought to pilot a boat into the river and was denied

 by the defendant, the captain of the vessel, who piloted it into and out of the river

 himself. The plaintiff sued for the fee and the defendant, on appeal, challenged the

 validity of the statute authorizing the licensing board alleging that it created a

 monopoly in violation of the emoluments and monopolies clauses of the North

 Carolina Constitution by limiting the number of pilots. This Court held the defendant

 could not present this argument because he did not lose any right of selection of pilot

 as he intended to pilot his own ship. “Nor will a court listen to an objection made to

 the constitutionality of an act by a party whose rights it does not affect, and who has,

 therefore, no interest in defeating it.” Id. at 97. Reasoning that the plaintiff was thus

 advancing the right of third parties, we noted that, as a principle of constitutional

 avoidance, we will pass upon the constitutionality of a legislative act “only in respect

 to those particulars, and as against those persons whose rights are thus
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 affected[;] . . . it is only where some person attempts to resist its operation and calls

 in the aid of its judicial power, to pronounce it void, as to him, his property, his rights,

 that the objection of unconstitutionality can be presented and sustained.” Id. at 98

 (quoting In re Wellington, 33 Mass. (16 Pick.) 87, 96 (1834)). St. George might best be

 understood as an application of the principle of jus tertii, prohibiting a party from

 raising the rights of third parties. See Holmes v. Godwin, 69 N.C. 467, 470 (1873) (“In

 general, jus tertii cannot be set up as a defence by the defendant, unless he can in

 some way connect himself with the third party.”).

¶ 61 We soon extended this principle to recognize that, in exercise of the equitable

 judicial power, a party was not entitled to injunctive relief as a matter of substantive

 law unless he would be irreparably harmed. See Newman v. Watkins, 208 N.C. 675,

 678 (1935) (“The plaintiffs sought in a court of equity to restrain an election. It was

 freely conceded upon the argument that unless the statute in question is

 unconstitutional, the plaintiffs were not entitled to the relief sought.”). This Court

 quoted a treatise which itself cited Frothingham for the principle that “[t]he party

 who invokes the power (of a court to declare an act of the legislature unconstitutional)

 must be able to show, not only that the statute is invalid, but that he has sustained

 or is immediately in danger of sustaining some direct injury as the result of its

 enforcement, and not merely that he suffers in some indefinite way in common with

 people generally.” Id. at 676–77 (quoting Willoughby, Willoughby on the Constitution
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

of the United States (2d ed.) § 13, p. 20).38 We have consistently required a showing

of direct injury in injunctive suits, emphasizing that this requirement is limited to

parties seeking injunctive relief declaring laws unconstitutional. See Leonard v.

Maxwell, 216 N.C. 89, 97 (1939), (“If others have been aggrieved [by provisions for

which plaintiff did not allege hurt], it suffices to say the plaintiff can speak only for

himself. In matters of constitutional challenge, he is not his brother’s keeper.”

(emphasis added) (citing Newman v. Watkins, 208 N.C. 675 (1935)); Yarborough v.

North Carolina Park Comm’n, 196 N.C. 284, 288 (1928) (“A party who is not

personally injured by a statute is not permitted to assail its validity; if he is not

injured, he should not complain because another may be hurt.”). In subsequent cases

we have required a plaintiff to show direct injury in the two modern contexts in which

injunctive relief remedied by declaring a law unconstitutional ordinarily arises—

actions under the Uniform Declaratory Judgment Act and challenges to zoning

ordinances. See, e.g., American Equitable Assur. Co. of N.Y. v. Gold, 248 N.C. 288

 38 This Court has also cited Ex parte Levitt for a near-identical proposition. See Turner

v. City of Reidsville, 224 N.C. 42, 47 (1944) (“It is an established principle that to entitle a
private individual to invoke the judicial power to determine the validity of executive or
legislative action he must show that he has sustained, or is in immediate danger of
sustaining, a direct injury as the result of that action and it is not sufficient that he has
merely a general interest common to all members of the public.” (quoting Ex parte Levitt, 302
U.S. 633 (1937))). Although we have cited these federal cases for this proposition in the past,
it does not follow that the requirement for direct injury in injunctive suits in North Carolina
is coterminous with these federal analogues. See Goldston, 361 N.C. at 35; accord Nicholson
v. State Ed. Assistance Authority, 275 N.C. 439, 448 (1969) (“A taxpayer, as such, may
challenge, by suit for injunction, the constitutionality of a tax levied, or proposed to be levied,
upon him for an illegal or unauthorized purpose.”).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 (1958) (plaintiffs adequately alleged personal, direct injury under Uniform

 Declaratory Judgment Act); Fox v. Board of Comm’rs of Durham County, 244 N.C.

 497 (1956) (no injury alleged in challenge zoning ordinance affecting county only as

 residents and taxpayers of county).

¶ 62 The “direct injury” required in this context could be, but is not necessarily

 limited to, “deprivation of a constitutionally guaranteed personal right or an invasion

 of his property rights.” State ex rel. Summrell v. Carolina-Virginia Racing Ass’n, 239

 N.C. 591, 594 (1954); see also Canteen Services v. Johnson, Comm’r of Revenue, 256

 N.C. 155, 166 (1962) (holding only persons “who have been injuriously affected . . . in

 their persons, property or constitutional rights” may challenge constitutionality of a

 statute). Notably, unlike in federal court, taxpayer status has long served as a basis

 for challenges alleging the unconstitutional or illegal disbursement of tax funds. See

 Goldston v. State, 361 N.C. at 30–31 (citing Stratford v. City of Greensboro, 124 N.C.

 110, 111–112 (1899)). For example, we considered the standing of taxpayers to

 challenge the validity of a statute in Stanley v. Department of Conservation and

 Development, 284 N.C. 15 (1973). There, we held that the taxpayers were injured by

 a statute that exempted property from taxation, because this “increases the burden

 imposed upon all other taxable property.” Stanley, 284 N.C. at 29.

¶ 63 We have not yet addressed whether the requirement of a “direct injury” or, in

 other words, that a person be “adversely affected” by a statute, which we have applied
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 as a substantive requirement to entitle a plaintiff to injunctive relief, is also a

 constitutional requirement under the “judicial power” of Article IV, § 2 of our

 Constitution. This requirement is, however, founded on a longstanding concern that

 “[t]he courts never anticipate a question of constitutional law in advance of the

 necessity of deciding it.” Wood v. Braswell, 192 N.C. 588, 589 (1926). Notably in Wood,

 Chief Justice Stacy in a concurring opinion did locate this rule, along with our

 avoidance of venturing advisory opinions on constitutional questions, in Article IV,

 § 2, reasoning that “it is only in cases calling for the exercise of judicial power that

 the courts may render harmless invalid acts of the Legislature.” Id. at 590 (Stacy,

 C.J., concurring). The majority, however, did not go that far, implicitly reserving the

 question of whether this principle arises directly from the judicial power or as a

 prudential principle of judicial self-restraint.

¶ 64 We have since clarified that the rule requiring direct injury to challenge the

 constitutionality of a statute is based on the rationale “that only one with a genuine

 grievance, one personally injured by a statute, can be trusted to battle the issue.”

 Stanley v. Department of Conservation and Development, 284 N.C. 15, 28 (1973). In

 Stanley, citing Flast approvingly for the rationale underpinning federal standing

 announced in Baker, we held

 [t]he “gist of the question of standing” is whether the party
 seeking relief has “alleged such a personal stake in the
 outcome of the controversy as to assure that concrete
 adverseness which sharpens the presentation of issues
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 upon which the court so largely depends for illumination of
 difficult constitutional questions.”

 Id. (quoting Flast v. Cohen, 392 U.S. 83, 99 (1968)). As in the case “in which there is

 no actual antagonistic interest between the parties, or where it appears that the

 parties are as one in interest and desire the same relief,” Bizzell, 248 N.C. at 295

 (citations omitted), we held that “[w]henever it appears that no genuine controversy

 between the parties exists, the Court will dismiss the action ex mero motu.” Stanley,

 284 N.C. at 29 (citing Bizzell, 248 N.C. 294).

¶ 65 As we have shown, the general question of standing under the North Carolina

 Constitution is motivated by a pragmatic and functional concern with ensuring

 “concrete adverseness” that “sharpens the presentation of issues” upon which we

 depend, in contrast to the federal standing doctrine which is motivated by both

 separation-of-powers and federalism concerns. We hold, therefore, that the “concrete

 adverseness” rationale undergirding our standing doctrine is grounded on prudential

 principles of self-restraint in exercise of our power of judicial review for

 constitutionality, which is itself only an incident of our exercise of the judicial power

 to determine the law in particular cases. See Bayard, 1 N.C. (Mart.) at 6–7. As this

 rationale is directly related to the circumstances under which we assert our power

 and duty to declare laws unconstitutional, it applies to challenges necessitating the
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 resolution of “constitutional questions.”39 Stanley, 284 N.C. at 28 (quoting Flast, 392

 U.S. at 99). Indeed, it is only in this context of invoking the “judicial power” to review

 the constitutionality of legislative and executive acts that the direct injury

 requirement can be understood. It therefore does not necessarily follow that our

 requirement for direct injury applies to suits not arising under the constitution, but

 instead based on common law or statutory right.40

¶ 66 We have long held that a plaintiff can maintain an action for infringement of

 a common law interest irrespective of any “actual” injury that may occur to her. For

 instance, we have not dismissed trespass actions where there is no allegation of harm

 beyond the infringement of the legal right. See Keziah v. Seaboard Air Line R. Co.,

 272 N.C. 299, 311 (1968) (“Any unauthorized entry on land in the actual or

 constructive possession of another constitutes a trespass, irrespective of degree of force

 used or whether actual damages is done.” (emphasis added)); see also Hildebrand v.

 39 This is not the only vital question of justiciability we have recognized is a matter of

 prudential self-restraint. In In re Peoples, we recognized that while “[i]n federal the mootness
 doctrine is grounded primarily in the ‘case or controversy’ requirement of Article III, Section
 2 of the United States Constitution and has been labeled ‘jurisdictional’ by the United States
 Supreme Court . . . [i]n state courts [including North Carolina] the exclusion of moot
 questions from determination is not based on a lack of jurisdiction but rather represents a
 form of judicial restraint.” In re Peoples, 296 N.C. 109, 147 (1978).
 40 In the context of an action challenging the constitutionality of a legislative or

 executive action, we emphasize the requirement for “direct injury” or that the complaining
 party be “adversely affected” by the action does not incorporate the “injury-in-fact”
 requirement of federal law. As discussed in detail above, that test arose in 1970 in the context
 of an interpretation of a provision of the federal APA; whatever its merits as a requirement
 of the federal constitution, it has no connection to the text or history of our state
 constitutional provisions or the doctrines we have developed in accordance with them.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

Southern Bell, 219 N.C. 402, 408 (1941) (holding landowner “is entitled to be

protected as to that which is his without regard to its money value”). Indeed, “[s]uch

entry entitle[s] the aggrieved party to at least nominal damages.” Keziah, 272 N.C.

at 311. Actions for breach of contract can, in some circumstances, proceed on a theory

of nominal damages. See, e.g., Bryan Builders Supply v. Midyette, 274 N.C. 264, 271

(1968) (explaining that in a contract action proof of breach alone is enough to avoid

judgment of nonsuit). Even in a common law action where actual injury is a necessary

element of the claim, such as negligence, the proper disposition for failure to allege

actual injury or damages is not dismissal for lack of standing, but dismissal for failure

to state a claim upon which relief can be granted. See, e.g, Hansley v. Jamesville &

W.R. Co., 115 N.C. 602, 613 (1894) (“Neither negligence without damage nor damage

without negligence will constitute any cause of action.”).41 As one commentator has

noted, at common law, “[l]egal injuries were conceptualized in terms of the experience

of physical injury, but the former was not confused with the latter. It is only in this

sense that there could be a notion of damnum absque injuria—that is, damage

without cognizable legal injury.” Winter, Metaphor, 40 Stan. L. Rev. at 1397.42

 41 As the Court of Appeals below noted, “[i]f EMPAC had slandered Mr. Forest in its

political ad, Mr. Forest would have had standing to seek at least nominal damages for this
tort, even though he won the election.” See Comm. to Elect Dan Forest, 260 N.C. App. at 7
(citing Wolfe v. Montgomery Ward, 211 N.C. 295, 296 (1937)).
 42 One possible exception is the private action for common law public nuisance, but

while our courts have sometimes characterized the requirement of a showing of special
damages or invasion of a right not considered merged in the general public right in such an
action as a requirement for “standing,” see, e.g., Neuse River Foundation, Inc. v. Smithfield
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

¶ 67 We have also long held that where the Legislature has created a statutory

 cause of action, so long as the plaintiff falls in the class of persons on which the statute

 confers the right, the courts will hear her claim. As we previously noted, since the

 nineteenth century, our Court has permitted citizens to bring citizen-suits alleging

 no personal injury or interest besides the statutory grant under statutory analogues

 to the common-law prerogative writs, such as the action in the nature of a writ quo

 warranto. See Hall, 111 N.C. at 371. We continue to recognize the Legislature’s power

 to create such ‘standingless’ causes of action based upon purely ‘public’ rights. State

 ex rel. Summrell v. Carolina-Virginia Racing Association, 239 N.C. 591 (1954),

 authored by Justice (later, Chief Justice) William Bobbitt for the Court, is most

 instructive.

¶ 68 In Summrell, a plaintiff who was a resident of Currituck County sued “to

 perpetually enjoin, as a nuisance as defined by N.C.G.S. § 19-1, the defendant’s

 maintenance and use of certain premises, buildings, fixtures and machines, for the

 Foods, Inc., 155 N.C. App. 110, 115 (2002), dismissal for lack of subject-matter jurisdiction in
 such cases is based not on a constitutional requirement for standing or injury, but on the
 absence of any possible damages to be recovered. See Hampton v. Pulp Co., 223 N.C. 535, 544
 (1943) (“The real reason on which the rule denying individual recovery of damages [for public
 nuisances absent special damages or invasion of some right not considered merged in the
 general public right] is based—and the only one on which the policy it reflects could be
 justified—is that a purely public right is of such a nature that ordinarily an interference with
 it produces no appreciable or substantial damage.”). In such cases, the absence of special
 damages or infringement of a right precludes establishment of the private cause of action at
 all, but as discussed below, a public action for abatement of public nuisance, including one
 maintained by any “private citizen of the county,” is still available. See N.C.G.S. § 19-2.1
 (2019).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

purpose of gambling.” Id. at 591. The defendant Racing Association was a private

corporation granted a franchise as a result of an act of the General Assembly.

Pursuant to that law, an election was held at which a majority of the voters

participating voted in favor of a countywide Racing Commission. Id. To enforce its

prohibition against the nuisances listed in § 19-1, the General Assembly chose to

create a civil action at N.C.G.S. § 19-2, under which the plaintiff sued as relator,

which provided as follows:

 “Any citizen of the county may maintain a civil action in
 the name of the State of North Carolina upon the relation
 of such . . . citizen, to perpetually enjoin said nuisance, the
 person or persons conducting or maintaining the same, and
 the owner or agent of the building or ground upon which
 said nuisance exists.”

Id. at 594 (quoting N.C.G.S. § 19-2 (1965)). The action created by the General

Assembly was plainly a “public action” as we discussed above—a “case[ ] in which a

plaintiff, in some fashion or other, asserts the public’s interest rather than just his

own—in an attempt to challenge the actions of the government or a private party.”

Gene R. Nichol, Jr., The Impossibility of Lujan’s Project, 11 Duke Envtl. L. & Pol’y F.

193, 194 (2001). The plaintiff’s interest, even as recognized by the statute, was no

different than that of any other “citizen” of his county.43 It certainly could not be

 43 It is worth noting, though not strictly necessary to our present purposes, that the

constitutionality of the act authorizing the commission was implicitly at issue in the claim
because, if the act was valid, the plaintiff could not prevail on his substantive nuisance claim.
Thus, this Court recognized, in this instance at least, that a statutory cause of action could
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 contended to be “concrete” or “particularized.” Lujan, 504 U.S. at 560. Nevertheless,

 this Court reversed the trial court’s decision that it lacked “legal authority” to pass

 upon the action, holding that “the plaintiff’s action is not grounded on general

 equitable principles but on the express authority of [the statute], and he is entitled to

 injunctive relief if he can prove his allegations that the defendant is conducting and

 maintaining a gambling establishment.” Summrell, 239 N.C. at 594 (emphasis

 added).

¶ 69 Nor was Summrell the last time this Court recognized the Legislature’s power

 to create causes of action and permit a plaintiff to recover in the absence of a

 traditional injury. In Bumpers v. Community Bank, 367 N.C. 81, 88 (2013), for

 instance, we held the General Assembly had authority to prohibit unfair and

 deceptive trade practices and to create a private cause of action in favor of a class of

 individuals to enforce this prohibition. In order to come within the class of persons

 protected by the statute the plaintiff must have been “injured by reason of any act or

 thing done by any other person, firm or corporation in violation of the provisions of

 this Chapter,” N.C.G.S. § 75-16 (2011); however, “[t]his statute is broader and covers

 more than traditional common law proscriptions on tortious conduct, though fraud

 provide a basis for judicial review of the constitutionality of a legislative act where there was
 effectively no citizen standing, on the basis that the action was not grounded on equity, but
 statute. This bolsters our conclusion that standing is a prudential, not purely constitutional,
 restraint on this Court’s exercise of the “judicial power.”
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 and deceit tend to be included within its ambit.” Bumpers, 367 N.C. at 88. Thus,

 North Carolina’s Unfair and Deceptive Trade Practices Act expanded the injury for

 which a plaintiff could recover beyond the common law and the question of the

 plaintiff’s standing was not even raised.

¶ 70 In Addison v. Britt, 83 N.C. App. 418 (1986), a case involving the federal Truth

 in Lending Act, our Court of Appeals concluded that “[o]nce a violation of an

 actionable portion of the [Truth in Lending Act] is established, the debtor is entitled

 to recover statutory damages [and that b]ecause the purpose of that section is to

 encourage private enforcement of the Act, proof of actual damages is unnecessary.”

 Id. at 421 (emphasis added). Thus, the civil action under the Truth in Lending Act

 reflects a “private attorney general” action, in the sense that Congress, to promote

 the purposes of the Act, has empowered private individuals to sue to vindicate the

 public interest and to recover based on the statutory damage formula, regardless of

 the damages actually accumulated. Furthermore, the Act did not require “that the

 debtors have been misled or deceived in any way.” Id. Thus, the Act authorized “any

 person [who] is liable to such [creditor failing to comply with the Act]” to recover

 under the Act, irrespective of actual injury resulting from infringement of the Act.

 See 15 U.S.C. § 1640(a) (1982).

¶ 71 In summary, our courts have recognized the broad authority of the legislature

 to create causes of action, such as “citizen-suits” and “private attorney general
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 actions,” even where personal, factual injury did not previously exist, in order to

 vindicate the public interest. In such cases, the relevant questions are only whether

 the plaintiff has shown a relevant statute confers a cause of action and whether the

 plaintiff satisfies the requirements to bring a claim under the statute. There is no

 further constitutional requirement because the issue does not implicate the concerns

 that motivate our standing doctrine. See, e.g., Stanley, 284 N.C. at 28. The existence

 of the legal right is enough.

¶ 72 Having surveyed the relevant English, American, and North Carolina law of

 standing, we are finally in a position to determine whether, as EMPAC and the

 dissent below argue, the North Carolina Constitution imposes an “injury-in-fact”

 requirement, as under the federal constitution. While our Court of Appeals has

 previously come to that conclusion, which was followed by numerous panels of that

 court, see, e.g., Neuse River Foundation, Inc. v. Smithfield Foods, Inc., 155 N.C. App.

 110, 113–15 (2002) (holding North Carolina law requires “injury in fact” for standing

 and applying Lujan), we are not bound by those decisions and conclude our

 Constitution does not include such a requirement.

¶ 73 First, the federal injury-in-fact requirement has no place in the text or history

 of our Constitution. Our Constitution includes no case-or-controversy requirement,

 upon which the federal injury-in-fact requirement is based. Rather, as discussed

 above, the “judicial power” provision of our Constitution imposes no particular
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 requirement regarding “standing” at all. Rather, as a rule of prudential self-restraint,

 we have held that, in order to assure the requisite “concrete adverseness” to address

 “difficult constitutional questions,” we have required a plaintiff to allege “direct

 injury” to invoke the judicial power to pass on the constitutionality of a legislative or

 executive act. See Stanley, 284 N.C. at 28. This standing principle arises as an

 incident of our power and duty to determine whether executive or legislative acts

 violate the constitution in the resolution of actual controversies. However, where a

 purely statutory or common law right is at issue, this rationale is not implicated, and

 a showing of direct injury beyond the impairment of the common law or statutory

 right is not required.

¶ 74 Second, the injury-in-fact standard is inconsistent with the caselaw of this

 Court. To be sure, our own decisions have not always maintained these distinctions

 with exactitude—or avoided the doctrinal encumbrances which have attached to the

 “slogans and litanies” of standing decisions as barnacles to the hull. Nichol,

 Rethinking Standing, 72 Cal. L. Rev. at 71. Dunn v. Pate, 334 N.C. 115 (1993),

 provides a particularly instructive example. In that case, we held defendants seeking

 to avoid having a 1962 deed set aside for failure to comply with a statute in effect at

 the time, which required the clerk of court to make a private examination of a wife

 whenever she and her husband entered into a contract to ensure the conveyance was

 neither unreasonable nor injurious to the wife, had standing to challenge the statute
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

as unconstitutional when the conveyance at issue apparently did not comply with the

allegedly discriminatory (and since-repealed) statutory requirement. Id. at 117. On

the way to holding the defendants in question had standing to attack the

constitutionality of the private examination statute, however, we partially overruled

a prior Court of Appeals decision while noting the court “correctly stated that the

petitioner ‘must allege she has sustained an “injury in fact” as a direct result of the

statute to have standing.’ ” Id. at 119 (quoting Murphy v. Davis, 61 N.C. App. 597,

600, cert. denied & appeal dismissed, 309 N.C. 192 (1983)). The Court of Appeals

decision, Murphy, which we had approved of in this respect had cited Article III, § 1

of the U.S. Constitution, Baker, and a case of this Court that itself precisely quoted

the standard we discussed above in Stanley that was derived from Baker via Flast.

However, the proposition in Murphy for which these sources were cited was entirely

different: that “Petitioner must allege she has sustained an ‘injury in fact’ as a direct

result of the statute to have standing to challenge the statute as violating either the

federal or the North Carolina constitutions.” Murphy, 61 N.C. App. at 600. Notably,

none of the sources cited in Murphy included the language “injury in fact” and, as

discussed in detail above, stand for entirely different propositions. Moreover, this

Court in Dunn did not itself rely on the federal “injury in fact” standard—throughout

the opinion we cited North Carolina caselaw and nowhere cited Lujan or Data

Processing, from which that language originates. Instead, we relied upon the familiar
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 principle that, in a challenge to the constitutionality of a statute, a party has standing

 if they have been “injuriously affected . . . in their . . . property . . . .” See Dunn, 334

 N.C. at 119 (quoting Canteen Service, 256 N.C. at 166). Nevertheless, the Court of

 Appeals and litigants have taken this apparent approval of an unsupported reference

 to “injury in fact” in Dunn and concluded we intended to incorporate federal standing

 requirements into North Carolina law. See, e.g., Neuse River Foundation, 155 N.C.

 App. at 114 (“Standing most often turns on whether the party has alleged ‘injury in

 fact’ in light of the applicable statutes or caselaw.” (citing, inter alia, Dunn, 334 N.C.

 at 119)); Coker v. DaimlerChrysler Corp., 172 N.C. App. 386, 390–92 (2005) (applying

 Neuse River Foundation’s adoption of Lujan’s standing requirements to hold plaintiff

 under UDTPA had not shown “injury in fact” to support standing). We conclude

 otherwise.44

¶ 75 The Court of Appeals’ misapplication of our standing requirements in Neuse

 River Foundation was also based on our opinion in Empire Power Co. v. North

 Carolina Department of Environment, Health and Natural Resources (DEHNR), 337

 N.C. 569 (1994). This case is particularly instructive, because it demonstrates how

 words can assume unintended meanings in the arena of standing. Empire Power Co.

 involved a challenge brought under the North Carolina Administrative Procedure Act

 44To the extent the Court of Appeals’ opinion in Neuse River Foundation, Inc. v.
 Smithfield Foods, Inc., 155 N.C. App. 110 (2002), is at odds with this opinion, we disavow it.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

(NCAPA), N.C.G.S. §§ 150B-1, et seq. (1991), and the Air Pollution Control Act

(APCA), N.C.G.S. §§ 143-215.105, et seq. (1993), appealing a decision of DEHNR

granting an air pollution control permit to a power company to the Office of

Administrative Hearings (OAH). Empire Power Co., 337 N.C. at 572. The petitioner

alleged DEHNR had violated its statutory duty to reduce air pollution under the

APCA by giving the power company a permit without addressing comments filed by

another power company. Id. at 572. The Court of Appeals concluded, and the power

company and DEHNR both argued before this Court, that the petitioner was not an

“aggrieved person” within the meaning of the NCAPA because the NCAPA cannot

confer a right to an administrative hearing in the OAH and that such a right must be

set forth in the organic statute at issue (there, the APCA). Id. at 574. This Court

reversed, holding that the petitioner had shown that he was a “person aggrieved”

under the NCAPA and thus “entitled to an administrative hearing to determine [his]

rights, duties, or privileges.” Id. at 588 (quoting N.C.G.S. § 150B-23(a) (1991)). We

noted that, under the NCAPA, “ ‘Person aggrieved’ means any person or group of

persons of common interest directly or indirectly affected substantially in his or its

person, property, or employment, by an administrative decision,” Id. at 588 (quoting

N.C.G.S. § 150B-2(6)), and held that the petitioner had established he was a “person

aggrieved” because he lived downwind of the permitted station and “alleged sufficient

injury in fact to interests within the zone of those to be protected and regulated by the
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 statute [(the APCA)], and rules and standards promulgated thereto, the substantive

 and procedural requirements of which he asserts the agency violated when it issued

 the permit.” Id. at 589 (emphasis added). This passing use of the phrase “injury in

 fact” was not in reference to any requirement of standing under the North Carolina

 Constitution, but whether the plaintiff had injuries to interests that fall within the

 zone of interests protected by the underlying statute such that the plaintiff was in

 the class of those “persons aggrieved” for whom the NCAPA conferred a right to an

 administrative decision.

 2. Does the Remedy Clause of the North Carolina Constitution Impose
 an “Injury-in-Fact” Requirement?

¶ 76 Finally, it might nevertheless be argued that the remedy clause of the North

 Carolina Constitution imposes a factual injury requirement for standing. In this case,

 the Court of Appeals, including both the majority and the dissent below, relied on our

 statement in Mangum v. Raleigh Board of Adjustment, 362 N.C. 640 (2008), to hold

 the North Carolina Constitution imposes an injury in fact requirement before a

 plaintiff may have standing.45 See Comm. to Elect Dan Forest, 260 N.C. App. at 6

 45 As an initial matter, we note that we did not impose a constitutional requirement

 of “injury-in-fact” in Mangum; rather, we held only that, where a petitioner files an action in
 the nature of certiorari to challenge a quasi-judicial decision under a zoning ordinance based
 on standing conferred under 160A-393(d)(2) (2019) (recodified at N.C.G.S. § 160D-1402(c)(2)),
 the petitioner must have alleged “special damages” to maintain the action and the allegations
 of the petitioner there were sufficient in that regard. See Mangum, 362 N.C. at 644; accord
 N.C.G.S. § 160D-1402(c)(2) (Supp. 2 2020) (“The following persons shall have standing to file
 a petition under this section: . . . Any other person who will suffer special damages as the
 result of the decision being appealed.”). The requirement for special damages to have
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

(“According to our Supreme Court, ‘[t]he North Carolina Constitution confers

standing on those who suffer harm[,]’ and that one must have suffered some ‘injury

in fact’ to have standing to sue.” (citing first Mangum, 362 N.C. at 642; and then

Dunn, 334 N.C. at 119); Id. at 13 (McGee, C.J., dissenting) (“ ‘As a general matter,

the North Carolina Constitution confers standing on those who suffer harm[.]’

Therefore, the North Carolina Constitution does not confer standing on those who

have not suffered harm.” (emphasis in original) (citations omitted)). In Mangum, we

stated “The North Carolina Constitution confers standing on those who suffer harm:

‘All courts shall be open; [and] every person for an injury done him in his lands, goods,

person, or reputation shall have remedy by due course of law . . . .” Mangum, 362 N.C.

at 642 (quoting N.C. Const. Art. I, § 18). While our statement in Mangum was an

adequate summary of the remedy clause’s effect on questions of standing—that the

provision “confers standing on those who suffer harm”—it does not follow that the

those who do not suffer “harm” lack “standing.” In terms of logic, “harm” is a sufficient

but not a necessary condition for “standing.” Much recent difficulty has arisen

because of our use of the term “harm.” Of course, the remedy clause does not speak

in terms of “harm” but “injury,” and we turn to the text and history to discern its

meaning.

standing to sue in such cases arises from the requirements of the statute which creates and
confers the cause of action on certain persons, not the constitution.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

¶ 77 Article I, section 18 of the North Carolina Constitution provides:

 All courts shall be open; every person for an injury done him
 in his lands, goods, person, or reputation shall have remedy
 by due course of law; and right and justice shall be
 administered without favor, denial, or delay.

 N.C. Const. art. I, § 18 (emphasis added). This provision has ancient roots in English

 and American law. Our most contemporary treatise on the North Carolina

 Constitution identifies the protean origins of Article I, § 18 as a principle in Magna

 Carta: “ ‘Nulli vendemus nulli negabimus aut differemus rectum vel justitiam.’ (‘To

 no one will we sell, to no one will we deny or delay right or justice.’)” John V. Orth

 and Paul Martin Newby, The North Carolina State Constitution 65 (2d ed. 2013)

 (quoting Magna Carta, § 40 (1215)). The second clause of the open courts provision,

 commonly termed a “remedy clause,” stemmed not from the text of Magna Carta, § 40

 itself, but from Lord Edward Coke’s influential commentaries on the provision in his

 Institutes of the Laws of England. See Orth and Newby, The North Carolina State

 Constitution 66 (noting that Lord Coke’s commentaries pointed out that “[o]pen

 courts were not enough . . . ; they had to be righting wrongs and doing justice”); see

 generally David Schuman, The Right to a Remedy, 65 Temp. L. Rev. 1197 (1992)

 (describing the origin, history, and interpretation of remedy clauses). Lord Coke

 reasoned that, by implication, Magna Carta necessitated more than merely “open”

 courts: “And therefore every Subject of the Realm, for injury done to him in bonis,

 terries, vel persona [goods, lands, or person] . . . may take his remedy by the course of
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 the Law . . . .” Orth and Newby, The North Carolina State Constitution 66 (quoting

 Edward Coke, Institutes of the Laws of England (London: Society of Stationers, 1641),

 vol. 2, 55–56).

¶ 78 Prior to Mangum, we had never construed this provision to implicate standing.

 Rather, we have focused on whether the legislature may restrain the remedies

 available in certain ways. For instance, we have held the remedy clause of the open

 courts provision permitted the legislature to abolish punitive damages for a libeled

 plaintiff if a timely retraction was printed, however, we stated in dicta that abolishing

 compensatory damages would have violated the clause. Osborn v. Leach, 135 N.C.

 628, 639–40 (1904). Moreover, we have held the legislature does not violate the clause

 by instituting a statute of repose, because the “the remedy constitutionally

 guaranteed must be one that is legally cognizable,” and “[t]he legislature has the

 power to define the circumstances under which a remedy is legally cognizable and

 those under which it is not.” Lamb v. Wedgewood S. Corp., 308 N.C. 419, 444 (1983).46

¶ 79 How the remedy clause interacts with standing presents another question.

 This question turns not on what “remedy” is guaranteed, but what the term “injury”

 means in the phrase so as to entitle a plaintiff to a remedy. Although the provision in

 its present incarnation was first incorporated into the Declaration of Rights as Article

 46 In Lamb, we expressly reserved the question whether “the legislature may
 constitutionally abolish altogether a common law cause of action.” Id. at 444.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 I, § 35 at the 1868 Constitutional Convention, it was not discussed in the records of

 Convention. See Journal of the Constitutional Convention of the State of North

 Carolina (Raleigh, Joseph W. Holden, 1868). While we cannot infer the intent of the

 framers from this silent record, commentators have noted “the enactment of these

 provisions was generally motivated by concerns that the legislature, and sometimes

 even the courts, might block access to justice. Thus, rather than restricting legislative

 conferrals [of standing], if anything, they suggest a constitutional mood favorable to

 broad access to the courts.” James W. Doggett, “Trickle Down” Constitutional

 Interpretation: Should Federal Limits on Legislative Conferral of Standing be

 Imported into State Constitutional Law?, 108 Col. L. Rev. 839, 878 (2008) (note)

 (footnotes omitted). Acknowledging this background, we nevertheless must interpret

 our open courts provision based on contemporaneous understandings and the

 common law background, which, as we have seen, continued to inform lawmakers

 well into the nineteenth century.

¶ 80 The concept of “injury” to which Lord Coke referred in his Institutes and which

 pervaded the common law of England and in America is entirely distinct from the

 concept of “injury in fact” in modern caselaw, encompassing “injuries” which did not

 include factual harm. For instance, in his own Commentaries, Blackstone recognized

 the writs of mandamus and prohibition, discussed in detail above, “redressed the

 legal injuries of ‘refusal or neglect of justice’ and ‘encroachment of jurisdiction,’
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

respectively.” Winter, Metaphor, 40 Stan. L. Rev. at 1397 (quoting 3 William

Blackstone, Commentaries *111).47

 The term ‘injury’ referred to ‘any infringement of the rights
 of another . . . for which an action lies at law.’ Legal
 injuries were conceptualized in terms of the experience of
 physical injury, but the former was not confused with the
 latter. It is only in this sense that there could be a notion
 of damnum absque injuria—that is, damage without
 cognizable legal injury.

Id. (footnotes omitted) (quoting 1 W. Jowitt, The Dictionary of English Law 977 (2d

ed. 1977)). As Professor Hessick has noted,

 [f]actual injury (damnum) alone was not sufficient to
 warrant judicial intervention; rather, a person could
 maintain a cause of action only if he suffered a legal injury,
 that is, the violation of a legal right (injuria). A factual
 harm without a legal injury was damnum absque injuria,
 and provided no basis for relief.

Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L. Rev. at 280–81

(citing 1 Theodore Sedgwick, A Treatise on the Measure of Damages § 32, at 28 (Arthur

G. Sedgwick and Joseph H. Beale eds., 9th ed. 1920)). However, while damnum

absque injuria (factual harm without legal injury) was insufficient at common law,

injuria sine damno (legal injury without factual harm) sufficed. As Professor Hessick

recounts, the seminal case of Ashby v. White, 2 Ld. Raym. 938, 92 Eng. Rep. 126,

 47 As Professor Winter notes, “if Blackstone’s definitions of these ‘injuries’ sound
strange to modern ears, it is because today’s jurisprudence treats ‘injury-in-fact’ in literalist
terms. But the common law usage of the term ‘injury’ was plainly metaphoric.” Id. at 1397.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

(1702) (Holt, C.J., dissenting), rev'd, 3 Salk. 17, 91 Eng. Rep. 665, would ultimately

resolve this question:

 The distinction between actions on for trespass [(which did
 not require factual harm)] and actions on the case [(which
 initially did)] began to collapse in the early eighteenth
 century as courts became resistant to denying relief to
 plaintiffs whose rights had been violated but who could not
 demonstrate harm. In the English case Ashby v. White,
 Chief Justice Holt rejected the notion that a plaintiff could
 not maintain an action on the case arising from the
 violation of a right if he suffered no harm. He explained
 that “[i]f the plaintiff has a right, he must of necessity have
 a means to vindicate and maintain it, and a remedy if he is
 injured in the exercise or enjoyment of it; and indeed it is a
 vain thing to imagine a right without a remedy; for want of
 right and want of remedy are reciprocal.” Responding to
 the argument that an action on the case was “not
 maintainable because here is no hurt or damage to the
 plaintiff,” Chief Justice Holt argued that “surely every
 injury imports a damage, though it does not cost the party
 one farthing, and it is impossible to prove the contrary; for
 a damage is not merely pecuniary, but an injury imports a
 damage, when a man is thereby hindered of his right.”
 Regardless of the type of action, the violation of the right
 was what mattered.

Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L. Rev. at 281–82

(footnotes omitted).48 The validity of Justice Holt’s views in Ashby has been affirmed

by this Court as a matter of North Carolina common law. See, e.g., Eller v. Carolina

 48 “Although Chief Justice Holt’s opinion was in dissent, his judgment prevailed on

appeal in the House of Lords. By the nineteenth century, both England and the United States
regarded Chief Justice Holt’s view as correctly stating the law.” Hessick, Standing, Injury in
Fact, and Private Rights, 93 Cornell L. Rev. at 282–83 (footnotes omitted).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 & W Ry. Co., 140 N.C. 140, 142 (1905) (“Plaintiff may recover what we call nominal

 damages, which are really no pecuniary compensation, but which merely ascertain or

 fix his right or cause of action. Lord Holt has well said: ‘Surely every injury imports

 a damage, though it does not cost the party one farthing, and it is impossible to prove

 the contrary; for a damage is not merely pecuniary, but an injury imports a damage

 when a man is thereby hindered of his right.’ ” (quoting Ashby, 2 Ld. Raymd. at

 938)).49

¶ 81 Therefore, the word “injury” in the remedy clause of our Constitution’s open

 courts provision, derived from the common-law concept of “injuria,” means, at a

 minimum, the infringement of a legal right; not necessarily “injury in fact” or factual

 harm, derived from the contrary concept of “damnum.” Taking the remedy clause as

 a whole and in the context of this history, it cannot be understood to impose a

 limitation on the power of the courts to hear a claim, under the “injury in fact” test

 or otherwise.50 For the same reason, the remedy clause cannot be understood to

 49 Lord Holt’s rule in Ashby was well-established in North Carolina by 1855, prior to

 the 1868 Convention. See, e.g., Bond v. Hilton, 47 N.C. (2 Jones) 149, 150–51 (1855) (per
 curiam) (“Wherever there is a breach of an agreement, or the invasion of a right, the law
 infers some damage, and if no evidence is given of any particular amount of loss, it gives
 nominal damages, by way of declaring the right, upon the maxim, ubi jus ibi remedium.”
 (citing Ashby v. White, 1st Salk. 19)).
 50 Thirty-nine state constitutions have remedy clause provisions identical or similar

 to ours. See Schuman, The Right to a Remedy, 65 Temp. L. Rev. at 1201–02 (identifying these
 provisions). The only state we have identified that construes the remedy clause of its open
 courts provision to impose a standing requirement is Texas, where our sister supreme court
 has held that “[u]nder the Texas Constitution, standing is implicit in the open courts
 provision, which contemplates access to the courts only for those litigants suffering an
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 impose a limitation on the legislature’s power to create new legal rights. To the

 contrary, by its express terms, which provide that “every person for an injury done

 him . . . shall have remedy by due course of law,” to the extent it implicates the

 doctrine of standing, our remedy clause should be understood as guaranteeing

 standing to sue in our courts where a legal right at common law, by statute, or arising

 under the North Carolina Constitution has been infringed. N.C. Const. Art. I, § 18,

 cl. 2 (emphasis added).

 G. The Law of Standing in North Carolina Summarized

¶ 82 In summary, the “judicial power” under the North Carolina Constitution is

 plenary, and “[e]xcept as expressly limited by the constitution, the inherent power of

 the judicial branch of government continues.” Beard v. North Carolina State Bar, 320

 N.C. 126, 129 (1987). As an exercise of the judicial power entrusted in us by the people

 of North Carolina in our Constitution, we have the power and duty to determine the

 law in particular cases and, as a necessary incident of that duty, the power to conduct

 judicial review of executive and legislative actions for constitutionality when

 necessary to resolve a case. Bayard, 1 N.C. (Mart.) at 6–7. We have held that, in

 directly attacking the validity of a statute under the constitution, a party must show

 injury,” and has applied the standing principle of federal law, including Lujan. Texas Ass’n
 of Business v. Texas Air Control Bd., 852 S.W.2d 440, 444 (1993); see id. at 445 (citing Lujan,
 504 U.S. 555). We are not persuaded by its reasoning. See Doggett, “Trickle Down”
 Constitutional Interpretation, 108 Col. L. Rev. at 878 (cautioning against adopting the Texas
 approach because it conflicts with the purposes underlying the adoption of open court
 provisions).
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

they suffered a “direct injury.” Summrell, 239 N.C. at 594; see also Stanley, 284 N.C.

at 28 (holding party must be “personally injured” to attack validity of statute). The

personal or “direct injury” required in this context could be, but is not necessarily

limited to, “deprivation of a constitutionally guaranteed personal right or an invasion

of his property rights.” Summrell, 239 N.C. at 594; see also Canteen Services, 256 N.C.

at 166 (holding only persons “who have been injuriously affected . . . in their persons,

property or constitutional rights” may challenge constitutionality of a statute). The

direct injury requirement applicable in cases involving constitutional challenges to

the validity of government action is a rule of prudential self-restraint based on

functional concern for assuring sufficient “concrete adverseness” to address “difficult

constitutional questions”:

 “ ‘[t]he “gist of the question of standing” is whether the
 party seeking relief has “alleged such a personal stake in
 the outcome of the controversy as to assure that concrete
 adverseness which sharpens the presentation of issues
 upon which the court so largely depends for illumination of
 difficult constitutional questions.’ ”

Goldston, 361 N.C. at 30 (quoting Stanley, 284 N.C. at 28 (quoting Flast v. Cohen, 392

U.S. 83, 99 (1968))). When a person alleges the infringement of a legal right arising

under a cause of action at common law, a statute, or the North Carolina Constitution,

however, the legal injury itself gives rise to standing. The North Carolina

Constitution confers standing to sue in our courts on those who suffer the

infringement of a legal right, because “every person for an injury done him in his
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 lands, goods, person, or reputation shall have remedy by due course of law.” N.C.

 Const. art. I, § 18, cl. 2. Thus, when the legislature exercises its power to create a

 cause of action under a statute, even where a plaintiff has no factual injury and the

 action is solely in the public interest, the plaintiff has standing to vindicate the legal

 right so long as he is in the class of persons on whom the statute confers a cause of

 action.51

 H. Standing under the Disclosure Statute

¶ 83 Having followed the tortuous track through the thorny thicket of standing that

 brought us here, applying the law is simple. The Committee has alleged EMPAC

 violated the requirements of the Disclosure Statute. Part of the Disclosure Statute

 creates a cause of action permitting the candidate targeted by the illegal ad to enforce

 the regulations by bringing suit and establishing statutory damages he can seek. This

 provision is one of many where our General Assembly has provided for such private

 51 Showing a party falls within the class of persons on whom the statute confers a

 cause of action may require a showing of some special injury depending on the statutory
 terms. For instance, our zoning statutes confer standing to maintain a cause of action in the
 nature of certiorari appealing a quasi-judicial zoning action on certain classes of persons,
 including “person[s] who will suffer special damages as the result of the decision being
 appealed.” N.C.G.S. § 160D-1402(c)(2) (Supp. 2 2020); see Mangum, 362 N.C. at 644. In
 certain cases, a cause of action may be implied from the statutory scheme. For example, to
 be entitled to administrative hearing under the NCAPA, a petitioner must show they are a
 “party aggrieved” by agency action, but where the underlying organic statute does not
 expressly create a right to a hearing, we have nevertheless held that those who “alleged
 sufficient injury in fact to interests within the zone of those to be protected and regulated by
 the [underlying] statute,” would have a right to an administrative hearing under the NCAPA
 as a “person aggrieved.” Empire Power Co., 337 N.C. at 589.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

 enforcement. The record indicates the Committee has complied with the

 requirements of the Disclosure Statute.52

¶ 84 The Committee clearly falls under the class of persons on whom the Disclosure

 Statute confers a cause of action. Mr. Forest was the candidate against whom the ad

 below was run. He has assigned his interest in the case to his Committee. EMPAC

 contends that the Committee lacks standing because it cannot show “injury in fact”

 under Lujan. But, as discussed above, that is not the law of North Carolina. Under

 North Carolina law, the legislature may create causes of action, including “private

 attorney general actions” to vindicate even a purely public harm. Our requirement

 for a “direct injury” in cases where the plaintiff attacks the validity of a statute under

 the constitution does not apply here. Where the plaintiff has suffered infringement of

 a legal right arising under a statute that confers on a class of persons including the

 plaintiff a cause of action, and the plaintiff has satisfied the requirements of the

 statute, the plaintiff has shown standing under the North Carolina Constitution.

 Here, the Committee has standing based on the statutory cause of action created by

 the Disclosure Statute.

 IV. Conclusion

 52 EMPAC and the dissent below argued that the Committee did not comply with the

 “condition precedent” of the Disclosure Statute. We disagree and hold the Committee has
 satisfied this condition precedent for the reasons stated in the majority opinion below.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Opinion of the Court

¶ 85 The doctrine of standing in federal courts, including the “injury-in-fact”

 requirement, arises under the case-or-controversy provisions of the United States

 Constitution, by which exercise of the federal judicial power is limited. The North

 Carolina Constitution, by contrast, contains no analogous provision. Rather, in the

 context of standing, our “judicial power” is limited by principles of self-restraint

 requiring a “direct injury” when attacking the validity of a statute under the

 constitution. When a person alleges the infringement of a legal right directly under a

 cause of action at common law, a statute, or the North Carolina Constitution,

 however, the legal injury itself gives rise to standing. The North Carolina

 Constitution confers standing to sue in our courts on those who suffer the

 infringement of a legal right, because “every person for an injury done him in his

 lands, goods, person, or reputation shall have remedy by due course of law.” N.C.

 Const. art. I, § 18, cl. 2.

 AFFIRMED IN PART; DISRECTIONARY REVIEW IMPROVIDENTLY

 ALLOWED IN PART.53

 Justices BERGER and BARRINGER did not participate in the consideration

 or decision of this case.

 53 We originally granted EMPAC’s petition for discretionary review on the
 constitutionality of the Disclosure Statute. We decline to address that issue here.
 Chief Justice NEWBY concurring in the result.

¶ 86 I agree with the result reached by the majority. Nonetheless, I write separately

 because I differ in the rationale. A system of fair elections is foundational to self-

 government. Our state constitution acknowledges this principle and allows the

 General Assembly broad authority to enact laws to protect the integrity of elections

 and thus encourage public trust and confidence in the election process. Under that

 authority, the General Assembly enacted a “stand by your ad” law in 1999, requiring

 political ads to contain particular information it deemed necessary to inform the

 public of the ad sponsor. A nonconforming ad provides inadequate information, thus

 harming the public generally and an affected candidate specifically. Part of that

 statute allowed a candidate affected by the illegal ad to enforce the regulations by

 bringing suit and established statutory damages he or she could seek. This provision

 is one of many where our General Assembly has provided for such private

 enforcement.

¶ 87 Misinformation harms the public, particularly when the misinformation

 concerns candidates for elected office. Indeed, the North Carolina Constitution

 recognizes the people’s right to free elections, N.C. Const. art. I, § 10, which means

 that elections must be free from “interference,” John V. Orth & Paul Martin Newby,

 The North Carolina State Constitution 56 (2d ed. 2013). The General Assembly, under

 its constitutional mandate to protect fair play in elections, addressed the generally
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Newby, C.J., concurring in the result

 recognized threat that improper advertising poses to that goal. See, e.g., Citizens

 United v. FEC, 558 U.S. 310, 371, 130 S. Ct. 876, 916, 175 L. Ed. 2d 753, 802 (2010)

 (explaining that “disclosure permits citizens and shareholders to react to the speech

 of corporate entities in a proper way,” and “[t]his transparency enables the electorate

 to make informed decisions and give proper weight to different speakers and

 messages”); Buckley v. Valeo, 424 U.S. 1, 66–68, 96 S. Ct. 612, 657–58, 46 L. Ed. 2d

 659, 714–15 (1976) (describing the various reasons the government has a significant

 interest in ensuring that the public is well informed on matters related to

 campaigning and political candidates).

¶ 88 Some states may address this problem through criminal punishment or civil

 penalty for intentional violations of disclosure laws. See Friends of Joe Sam Queen v.

 Ralph Hise for N.C. Senate, 223 N.C. App. 395, 403 n.7, 735 S.E.2d 229, 235 n.7 (2012)

 (explaining the approaches to enforcement various states have taken). The General

 Assembly chose a different enforcement mechanism. By allowing actions by those

 candidates who have been affected by unlawful ads, the General Assembly sought to

 meaningfully secure a vital public interest and grant a specific legal path for the

 injured candidate to address the wrong. See N.C. Const. art. I, § 18. The General

 Assembly perhaps recognized that it is difficult to monitor all campaign ads, that the

 public is harmed even by unintentional misinformation, and that the affected

 candidate has the greatest incentive to pursue a remedy for illegal ads.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Newby, C.J., concurring in the result

¶ 89 Specifically, the General Assembly provided that when any entity creates a

 political campaign ad that violates certain disclosure requirements, the candidate

 affected by the unlawful ad “shall have a monetary remedy in a civil action against”

 the violator. N.C.G.S. § 163-278.39A(f) (2011) (emphasis added) (repealed 2014). The

 injuries to the public, to the election process, and to the individual candidate are hard

 to quantify: what is the monetary value of misleading information that may affect an

 election? The General Assembly thus provided for statutory damages. That monetary

 remedy is, according to the statute, equal to the amount the violating party spent to

 broadcast the unlawful ad. N.C.G.S. § 163-278.39A(f)(2). Only those candidates who

 have not violated any of the statutory provisions themselves may sue. N.C.G.S.

 § 163-278.39A(f). The candidate must file a notice of the complaint with the Board of

 Elections by the Friday following Election Tuesday. N.C.G.S. § 163-278.39A(f)(1). By

 the language of the statute, the General Assembly has decided that a candidate who

 complies with these requirements and shows a violation is entitled to statutory

 damages.

¶ 90 Plaintiff here has complied with all the statutory requirements. First, there is

 no evidence that plaintiff has violated any disclosure requirement; plaintiff has clean

 hands, as the General Assembly required. Next, both defendant and the Board of

 Elections received notice of the violation within the statutory period. Thus, sufficient

 evidence exists to show that plaintiff complied with any condition precedent to suing.
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Newby, C.J., concurring in the result

 There is no dispute that plaintiff’s complaint precisely tracks the requirements of the

 statute.

¶ 91 The only remaining question, then, is whether subsection 163-278.39A(f) is

 enforceable as written; in other words, is the statute constitutional? It is. Here the

 General Assembly used its longstanding constitutional authority to create causes of

 action like this one.

¶ 92 All political power resides in the people, N.C. Const. art. I, § 2, and the people

 act through the General Assembly. State ex rel. Ewart v. Jones, 116 N.C. 570, 570, 21

 S.E. 787, 787 (1895) (“[T]he sovereign power resides with the people and is exercised

 by their representatives in the General Assembly.”). The General Assembly therefore

 may presumptively take any legislative action not specifically prohibited by the North

 Carolina Constitution. McIntyre v. Clarkson, 254 N.C. 510, 515, 119 S.E.2d 888, 891

 (1961) (“[A] doctrine firmly established in the law is that a State Constitution is in no

 matter a grant of power. All power which is not limited by the Constitution inheres

 in the people, and an act of a State legislature is legal when the Constitution contains

 no prohibition against it.” (alteration in original) (quoting Lassiter v. Northampton

 Cnty. Bd. of Elections, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), aff’d, 360 U.S.

 45, 54, 79 S. Ct. 985, 991, 3 L. Ed. 2d 1072, 1078 (1959))). Thus, as this Court has

 regularly noted, any alleged constitutional limitation on the General Assembly’s
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Newby, C.J., concurring in the result

 power must be express and demonstrated beyond a reasonable doubt. E.g., Hart v.

 State, 368 N.C. 122, 126, 774 S.E.2d 281, 284 (2015).

¶ 93 In keeping with its general legislative power, the General Assembly has the

 authority to recognize threats to the public good, identify an injury, and provide for

 the appropriate remedy. A statute may create a private cause of action even if the

 common law would not provide that right. See Rhyne v. K-Mart Corp., 358 N.C. 160,

 169, 594 S.E.2d 1, 8 (2004) (The General Assembly is inarguably “the policy-making

 agency of our government, and when it elects to legislate in respect to the subject

 matter of any common law rule, the statute supplants the common law rule and

 becomes the public policy of the State in respect to that particular matter.” (quoting

 McMichael v. Proctor, 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956))).

¶ 94 The General Assembly may therefore create “private attorney general actions.”

 Private attorney general actions allow nongovernmental actors to enforce laws. These

 actions are integral to the well-being of this State’s citizens. They are often used when

 the harm is to the public generally and is difficult to quantify. Such a statute by its

 own accord recognizes that an injury has occurred and allows a specified party to sue

 for recovery. See, e.g., Mayton v. Hiatt’s Used Cars, Inc., 45 N.C. App. 206, 212, 262

 S.E.2d 860, 864 (1980) (indicating that when a statute allows for a private attorney

 general action, it may be irrelevant whether the party bringing the suit has suffered

 an “actual injury”). For an action to qualify as one brought by a private attorney
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Newby, C.J., concurring in the result

 general, the action usually must address a right that is important to the public

 interest and provide for private enforcement. See, e.g., Stephenson v. Bartlett, 177

 N.C. App. 239, 244, 628 S.E.2d 442, 445 (2006) (explaining the traditional treatment

 of private attorney general actions in the context of awards of attorney’s fees). These

 actions deter wrongdoing by incentivizing private parties to prosecute violations.

¶ 95 Indeed, the General Assembly has established a private enforcement

 mechanism like the one in this case in several other statutes. For example, North

 Carolina’s Open Meetings Law, which requires certain government meetings to be

 open to the public, allows for such suits. It says that “[a]ny person” may bring a suit

 for an injunction to force the government entity to comply with the law, and “the

 plaintiff need not allege or prove special damage different from that suffered by the

 public at large.” N.C.G.S. § 143-318.16A(a) (2019). The law allows the plaintiff to be

 awarded attorney’s fees upon prevailing in such a suit. N.C.G.S. § 143-318.16B

 (2019).

¶ 96 Some laws go even further, mirroring the statute in this case, by providing for

 specified statutory damages without requiring the plaintiff to prove actual injury. See

 N.C.G.S. § 75-56(b) (2019) (“Any debt collector who fails to comply with any provision

 of this Article with respect to any person is liable to such person in a private action

 in an amount equal to the sum of (i) any actual damage sustained by such person as

 a result of such failure and (ii) civil penalties the court may allow, but not less than
 COMM. TO ELECT DAN FOREST V. EMPAC

 2021-NCSC-6

 Newby, C.J., concurring in the result

 five hundred dollars ($500.00) nor greater than four thousand dollars ($4,000) for

 each violation.”); see also N.C.G.S. § 75-118(a)(2) (2019) (providing that any recipient

 of an unsolicited facsimile may bring a suit to recover “five hundred dollars ($500.00)

 for the first violation, one thousand dollars ($1,000) for the second violation, and five

 thousand dollars ($5,000) for the third and any other violation that occurs within two

 years of the first violation”). The General Assembly has therefore used its

 constitutional authority to recognize public injuries, declare an appropriate plaintiff,

 and fashion a proper remedy on several occasions, including in this case.

¶ 97 Private attorney general actions with statutory damages serve to vindicate the

 rights of an injured public when harm is hard to quantify. The General Assembly,

 within its constitutional authority, provided for such a cause of action and such

 damages in this case. Plaintiff has the right to sue under this statute, and neither the

 North Carolina Constitution nor this Court’s precedent limit courts from hearing the

 case.

¶ 98 I respectfully concur in the result.